OPINION BY STEVENS, P.J.E.:
*294 Appellant Victor Charles Mikitiuk appeals from the judgment of sentence entered in the Court of Common Pleas of Lebanon County following Appellant's conviction by a jury on one count of manufacture, delivery, or possession with the intent to manufacture or deliver a controlled substance (methamphetamine), one count of violation of the Controlled Substance, Drug, Device and Cosmetic Act (possessing phenylpropanolamine, phenyl acetone, methylamine, ammonium sulfate, ammonium nitrate, phenyl acetic acid or a precursor substance with intent to unlawfully manufacture a controlled substance), one count of risking a catastrophe, three counts of criminal conspiracy (conspiracy to possess with the intent to manufacture methamphetamine, risking a catastrophe, and violation of the Controlled Substance, Drug, Device and Cosmetic Act), and one count of possession of drug paraphernalia.[1] After a careful review, we affirm.
The relevant facts and procedural history are as follows: Following his arrest, Appellant, who was represented by counsel, proceeded to a jury trial on March 21, 2018, at which the Commonwealth presented the testimony of Sergeant Michael DiPalo and Detective Lawrence Minnick, both of whom are assigned to the Lebanon County Drug Task Force. Appellant presented no witnesses at trial.
Sergeant DiPalo testified that, on July 20, 2017, he received several phone calls from Kyle Leeper and Tony Kreider, with whom he was familiar, indicating that a domestic dispute and drug activity was occurring within a pick-up truck at the 200 block of North Railroad Street in Palmyra. N.T., 3/21/18, at 18-19, 44-45. Since Sergeant DiPalo was in Lebanon, he contacted the Palmyra Police Department and requested that officers from that department respond immediately to the scene. Id. at 19. Meanwhile, Sergeant DiPalo and Detective Minnick drove to the scene. Id.
Upon arrival, Sergeant DiPalo discovered Mr. Leeper in the driver's seat of the pick-up truck, and Crystal Anderson was seated in the passenger's seat. Id. at 20. Appellant had also been riding in the pick-up truck; however, by the time Sergeant DiPalo arrived on the scene, Appellant was standing outside of the vehicle. Id.
Sergeant DiPalo began his investigation and learned that, prior to his arrival, the Palmyra officers had seized a backpack from bushes located near the pick-up truck. Id. at 20, 48. The backpack contained iodized salt,[2] Liquid Fire (a liquid drain opener containing sulfuric acid and lye), household drain cleaner, lye pellets, a generator, coffee filters, and plastic baggies containing coffee filters with residue. Id. at 27. The backpack contained no evidence *295 identifying its owner. Id. at 48. Appellant was found in possession of 7-inch diagonal cutting pliers. Id. at 37.
Sergeant DiPalo testified the backpack was later destroyed "because of the toxic nature of the chemicals [contained therein], it permeates everything it comes in contact with. Some of the chemicals would cause the metal to rust. Some of it reacts with oxygen in the air and becomes flammable." Id. at 29. The sergeant testified the above items were consistent with those seized in other cases involving the manufacturing of methamphetamine and many of the items contained in the backpack were "methamphetamine precursors." Id. at 24, 37.
In the bed of the pick-up truck, Sergeant DiPalo observed equipment, including plastic bottles with attached aquarium hoses that act as a generator to produce hydrogen gas, bottles of lye, and bottles with a crystalline residue containing an oily liquid, which based on his experience, the sergeant recognized as being used in the manufacturing of methamphetamine. Id. at 20, 25-26. Sergeant DiPalo noted a baseball cap was seized from the pick-up truck. Id. at 65.
Sergeant DiPalo testified that, "because of the hazardous materials involved and the volatility of the substances," he contacted the Pennsylvania State Police so that the Clandestine Lab Team could respond to remove the items from the pick-up truck and backpack. Id. at 22. He noted that "special licensure" is needed to dispose of such items, and the Lab Team has the necessary licensure. Id. Sergeant DiPalo further noted that he and the other officers did not possess the necessary equipment, including respirators, air monitoring equipment, fireproof suits, nitrile gloves, and other testing/packaging equipment, to dispose of the hazardous materials. Id. Pennsylvania State Troopers and members of the Clandestine Lab Team, who were outfitted with "special chemical fire-resistant suit[s], as well as heavy gloves" and respirators, arrived, and as they seized the equipment, the sergeant took photographs.[3] Id. at 23, 26.
Sergeant DiPalo noted that some of the bottles in the pick-up truck had caps on them, including a plastic bottle containing crushed pseudoephedrine and a liquid. Id. at 31. He specifically explained the following:
The process [related to the bottles] is called a "one-pot" method. The manufacturing process is done in a plastic soda bottle. There are other methods that include the glass lab breakers, heat, and all of that. This is a method that allows an individual using Lithium and the other chemicals that were assembled to manufacture meth in the two-liter bottle.
As the manufacturing process continues, the bottle is vented at the top to release the gas. However, because of the volatility, the process requires several hundred pounds of pressure for the process to complete that the soda bottle can only withstand so much pressure. The venting process can risk an explosion and fire and cause burns should the timing be off and the bottle explodes.
Id. at 32. Sergeant DiPalo explained that he notified the Clandestine Lab Team to assist because of the risk of an explosion and fire. Id. He indicated the Clandestine Lab Team "deactivated" the bottles and *296 filtered the contents at the scene so as to render the items safe. Id. at 33.
Sergeant DiPalo testified that, by interviewing Ms. Anderson, he learned of possible drug activity in connection with a cabin on Palmyra Bellgrove Road in North Londonberry Township. Id. at 51. The cabin was owned by Peter McCurdy. Id. at 52.
On July 21, 2017, the police executed a search warrant at the cabin. Id. at 34. Sergeant DiPalo was present in the cabin during the execution of the search warrant, and he took photographs. Id. at 35. He testified that, as confirmed by the photographs entered into evidence, the police seized from the cabin cold compress boxes, empty blister packs from a pseudoephedrine-containing product, white plastic hose consistent with the hose found in the bed of the pick-up truck, and a package for pliers such as those seized from Appellant. Id. at 36-37, 53. Further, the police seized an empty Lithium battery package, which was lying in the leaves directly outside the back of the cabin. Id. at 37. Sergeant DiPalo testified that Lithium provides "a catalyst" for the manufacturing of methamphetamine. Id. Sergeant DiPalo admitted that none of the items seized from the cabin were dusted for fingerprints. Id. at 49. He indicated that he traced the UPC numbers on the packages for the pseudoephedrine-containing items and discovered that the items were purchased by Ms. Anderson and Tony Kreider's father at a local Walmart. Id. at 54.
Sergeant DiPalo testified the Swatara Township Police Department later provided him with a surveillance photograph of Appellant and Ms. Anderson stealing items from a hardware store in Dauphin County. Id. at 60-61. The stolen items included Liquid Fire, a bottle of lye, and rubber gloves. Id. at 60. Appellant and Ms. Anderson committed the retail theft on July 18 or 19, 2017, and Appellant later pled guilty to the retail theft in Dauphin County. Id. at 61, 67. Moreover, Sergeant DiPalo noted that a baseball cap worn by Appellant during the retail theft matched the baseball cap seized from the bed of the pick-up truck on July 20, 2017. Id. at 65. Further, the sergeant testified that, during the investigation of the current offenses, "Appellant...admitted to purchasing precursor items to include Liquid Fire[.]" Id.
At this point in the proceedings, the parties stipulated to various evidentiary items seized from the pick-up truck, including that seized bottles contained methamphetamine, pseudoephedrine, a Birch by-product formed when pseudoephedrine is converted into methamphetamine, petroleum distillate, and a reactive metal; seized tubing contained methamphetamine residue; the "headspace of [a] vial...contained hydrochloric acid vapor;" other seized bottles contained lye, acidic liquid, salt, and sulfuric acid; seized coffee filters contained pseudoephedrine /ephedrine residue; and seized instant ice compresses contained ammonium nitrate and water. Id. at 70-71.
Additionally, the parties stipulated that if Jessica Mulhollem, who is a forensic scientist employed by the Pennsylvania State Police, was called to testify, she would indicate the following as to the items seized from the scene at North Railroad Street:
Methamphetamine can be manufactured by a method referred to as the "One Pot" method. This method is performed in a single container. Pseudoephedrine or ephedrine, a reactive metal (such as Lithium ), a solvent, and a source of ammonia gas are placed in a container. Petroleum distillate mixtures such as lighter fuel are commonly used organic solvents. Ammonia gas may be generated by combining an ammonium salt with sodium hydroxide or potassium hydroxide in the reaction container. The *297 reaction between these materials will manufacture the pseudoephedrine or ephedrine into methamphetamine base, which can then be converted to methamphetamine hydrochloride by reacting it with hydrochloric acid. Hydrochloric acid gas may be generated by mixing sodium chloride, or table salt, with sulfuric acid. An impurity that is common to this reaction is a material referred to as the Birch by-product.
Id. at 72.
Moreover, the parties stipulated that forensic scientist Mulhollem was able to make the following conclusions based upon her testing of the items seized from the scene at North Railroad Street:
The analysis of the materials listed above indicates that methamphetamine had been manufactured by the method described above. Pseudoephedrine and/or ephedrine, solvents, ammonium nitrate, and sodium hydroxide were present. Sulfuric acid and sodium chloride, used to convert methamphetamine base into methamphetamine hydrochloride, were also present. Methamphetamine was present[.] The Birch by-product was also present[.] The bottle and contents...were consistent with a "one pot" reaction vessel and post-reaction materials. The cap and tubing...were consistent with a hydrochloric acid gas generator.
Id. at 72-73.
The parties also stipulated to various evidentiary items seized from the cabin on Palmyra Bellgrove Road, including that the seized empty blister packs were consistent with containing 5.76 grams of pseudoephedrine hydrochloride, seized battery strippings were consistent with those used on Lithium batteries, seized plastic tubing contained no controlled substances, and a box marked "instant ice compresses" was empty. Id. at 75. With regard to these items, forensic scientist Mulhollem was unable to make a conclusion as to whether methamphetamine had been manufactured at the cabin; however, the seized items were consistent with those used in such manufacturing. Id. at 76-77.
Detective Minnick confirmed that, on July 20, 2017, he went to the North Railroad Street location with Sergeant DiPalo, and he approached Appellant, who was sitting outside of the pick-up truck. Id. at 83-84. Appellant informed the detective that he was from New York, and Appellant asked if he could smoke a cigarette. Id. at 84. Detective Minnick testified he told Appellant "that was fine[,]" and Appellant indicated his cigarettes were in the bed of the pick-up truck. Id. Detective Minnick watched as Appellant "reached into the bed of the truck and took out a pack of cigarettes." Id. As Appellant took a cigarette out of the pack, Detective Minnick saw "a hypodermic syringe fall out into the bed of the truck." Id. at 85. Detective Minnick asked Appellant if the syringe belonged to him, and Appellant said, "Well look at the bag of clothing that I took it out of." Id. The bag contained female-type clothing. Id. at 93.
Detective Minnick testified Appellant was arrested, and the detective transported him to police headquarters where he was given his Miranda warnings and questioned. Id. at 85. Specifically, Detective Minnick testified as follows regarding his interview of Appellant:
[ADA]: Now, did you then ask [Appellant] about the activity that he was involved in?
[DETECTIVE MINNICK]: Yes.
[ADA]: What did he tell you?
[DETECTIVE MINNICK]: I asked him how he came into contact with Mr. Leeper and Crystal Anderson. He advised that he had made contact with *298 Kyle Leeper because Crystal Anderson used to date a friend of his. Through his conversations with Mr. Leeper, Mr. Leeper offered him "8-balls" of methamphetamine for $120. He said in New York, he is used to paying $240 to $260, so he was enticed by the amount he had to pay for methamphetamine down here.
I asked him how he came to be in Pennsylvania. He said on July 17th at approximately 3:00 a.m. Mr. Leeper had arrived in New York. He picked him up and transported him back to Pennsylvania.
[ADA]: Did [Appellant] indicate what the purpose of coming to Lebanon was?
[DETECTIVE MINNICK]: He did. Mr. Leeper asked him to come back to show him how to manufacture methamphetamine. The agreement was that Mr. Leeper provide quantities of methamphetamine and marijuana to [Appellant] for cheaper prices, so he agreed to come to Pennsylvania to show Mr. Leeper how to manufacture methamphetamine.
[ADA]: Did you ask [Appellant] whether or not he had actually manufactured the methamphetamine?
[DETECTIVE MINNICK]: Yes, I did. His response was that hadn't [sic ] done it before, but he helped people manufacture methamphetamine before. He described a "blue gun" method and I was unfamiliar with that. I asked him to describe that and he said it's apparently when you manufacture methamphetamine using a "one pot" method and you place a container inside of the ground to do the manufacturing.
[ADA]: So that was the information that he provided to you about a specific cooking process?
[DETECTIVE MINNICK]: Yes.
[ADA]: Now, did [Appellant] talk to you at all about the purchase of items that we know in law enforcement are called precursors?
[DETECTIVE MINNICK]: Yes, ma'am.
[ADA]: What was that discussion?
[DETECTIVE MINNICK]: He said when he was brought to Pennsylvania by Mr. Leeper, Mr. Leeper had him go to various stores to purchase precursors. He felt Mr. Leeper was doing that in order to test him to see if he really knew what he was talking about with manufacturing meth.
He said Mr. Leeper had transported he [sic ] and Crystal Anderson to various stores to include Lowes and Walmart to purchase these items. I asked him what he specifically had purchased and he referenced a white bottle of Liquid Fire. I asked him if he had purchased any other precursors such as pseudoephedrine tablets and he said no, and that Mr. Leeper had other people to do that for him.
[ADA]: Did you talk with [Appellant] also about the events of that particular day?
[DETECTIVE MINNICK]: Yes.
[ADA]: And what did he tell you about that?
[DETECTIVE MINNICK]: He advised that he was at Mr. Kreider's house with Crystal Anderson. Apparently they were inside of Mr. Kreider's house and Mr. Kreider was on probation. Probation officers had responded to the residence and surrounded it by knocking on the doors trying to make contact with Mr. Kreider. Because of what they were involved in, Mr. Kreider refused to answer the door. I believe it was referenced "If anyone answers the door and I'm going to jail, everyone is going to jail with me."
Eventually, probation officers ended up leaving. Crystal Anderson call[ed]
*299 Mr. Leeper who arrived in the truck and pick[ed] up she [sic ] and [Appellant] and they le[ft] Mr. Kreider's residence.
[Appellant] said they were driving around Palmyra and he said Mr. Leeper's driving was erratic and driving crazy until they had reached Railroad Street and came to a stop and were contacted by police.
[ADA]: Did [Appellant] tell you what specific location in that vehicle he was riding in?
[DETECTIVE MINNICK]: Yes, in the bed of the truck.
[ADA]: And that would be the bed where some of these contraband items were located?
[DETECTIVE MINNICK]: That is correct.
[ADA]: Did [Appellant] say anything else about the illegal activity that he was engaging in?
[DETECTIVE MINNICK]: He said he was supposed to cook methamphetamine for Mr. Leeper, but he said he had not done that yet. Mr. Leeper told him that he had a large amount of land for him to be able to cook this methamphetamine in isolation and private, but he hadn't had the opportunity to do that yet.
[ADA]: Overall, what was [Appellant's] attitude with you?
[DETECTIVE MINNICK]: Very cooperative and informative.
[ADA]: And he provided you with information that you didn't know before?
[DETECTIVE MINNICK]: That's correct.
[ADA]: And the information that he provided to you, was some of that able to be corroborated by other information?
[DETECTIVE MINNICK]: Yes.
[ADA]: Things like the Liquid Fire that he purchased-at least he claimed he purchased, that matched up with what Detective DiPalo testified [to] as far as items he was caught stealing?
[DETECTIVE MINNICK]: Correct. I was unaware of its existence until he had mentioned it, and again it was found at a later time.
Id. at 86-91.
Detective Minnick clarified that, although Appellant discussed the fact he had helped people "cook meth," he denied specifically doing it himself or being the lead in any sort of "meth cooking." Id. at 103. However, Appellant suggested he was "branching out down here [in Lebanon County] to get meth cheaper." Id. Detective Minnick noted that, sometimes, people will engage in "drug trafficking behavior" in order to obtain a share of drugs for themselves. Id.
Detective Minnick testified he cataloged and took photographs of items that were noted as specifically belonging to Appellant, including a New York identification card, lighters, tweezers, pliers, a knife, two hats, a piece of notebook paper with a list of ingredients written upon, a pack of cigarettes, a hypodermic syringe, a Lithium battery, and a cell phone. Id. at 100-01. He clarified that, with the exception of the pack of cigarettes and syringe, which Detective Minnick seized from Appellant, it was his understanding that the items were seized from Appellant by fellow officers. Id. at 104.
At the conclusion of all evidence, the jury convicted Appellant of the offenses indicated supra , and on July 18, 2018, the trial court sentenced Appellant to an aggregate of six years to fifteen years in prison. Appellant filed a timely, counseled post-sentence motion presenting sufficiency of the evidence, weight of the evidence, and sentencing claims. By order and opinion entered on November 15, 2018, the trial court granted, in part, and denied, in *300 part, Appellant's post-sentence motion. Specifically, the trial court denied all requests for relief, except the trial court ruled Appellant is RRRI eligible. On that same date, the trial court entered an amended sentencing order.
This timely appeal followed. The trial court directed Appellant to file a statement pursuant to Pa.R.A.P. 1925(b), Appellant timely complied, and the trial court filed a brief Pa.R.A.P. 1925(a) opinion indicating it was relying upon its previously filed opinion.
On appeal, Appellant sets forth the following issues:
1. Did the Trial Court err in ruling that the Commonwealth presented evidence at trial that was sufficient to sustain a conviction under 18 Pa.C.S.[A.] § 3302(b) ?
2. Did the Trial Court err in ruling that the Commonwealth presented evidence at trial that was sufficient to sustain a conviction under 35 P.S. § 780-113(a)(30) or 35 P.S. § 780-113(a)(32) ?
3. Did the Trial Court err in ruling that the jury's verdict was not against the weight of the evidence so as to warrant a new trial under Pa.R.Crim.P. 607 ?
4. Was Appellant denied the right to confront his accuser, in violation of the 6th Amendment of the United States Constitution?
Appellant's Brief at 6 (suggested answers omitted).
In his first issue, Appellant contends the evidence was insufficient to sustain his conviction for risking a catastrophe under 18 Pa.C.S.A. § 3302(b).[4] Specifically, Appellant contends there was no evidence that the transferring of the items in the pick-up truck created any level of risk of a catastrophe. Appellant's Brief at 15. Further, Appellant suggests there is no evidence he "played any role" with regard to the transferring, storing, or cooking of the items, and he was merely present. Id. at 15-16.
A successful sufficiency-of-the-evidence claim requires discharge. Commonwealth v. Toritto , 67 A.3d 29 (Pa.Super. 2013) (en banc ). Whether the evidence was sufficient to sustain the charge presents a question of law. Id. Our standard of review is de novo , and our scope of review is plenary. Commonwealth v. Walls , 144 A.3d 926 (Pa.Super. 2016). In conducting our inquiry, we examine:
whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, [is] sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part *301 or none of the evidence. For purposes of our review under these principles, we must review the entire record and consider all of the evidence introduced.
Commonwealth v. Trinidad , 96 A.3d 1031, 1038 (Pa.Super. 2014) (quotation omitted).
"Risking a catastrophe is a crime which was unknown to the law of Pennsylvania prior to the passage of the Crimes Code, Act of December 6, 1972, P.L. 1482, No. 334, § 1, eff. June 6, 1973, 18 Pa.C.S.A. [§] 3302." Commonwealth v. Simkins , 297 Pa.Super. 258, 443 A.2d 825, 827 (1982). The Crimes Code defines risking a catastrophe as follows:
(b) Risking catastrophe.-- A person is guilty of a felony of the third degree if he recklessly creates a risk of catastrophe in the employment of fire, explosives or other dangerous means listed in subsection (a) of this section.
18 Pa.C.S.A. § 3302(b).
The offense of risking a catastrophe, it will be observed, can occur only in the employment of fire, explosives, or "other dangerous means" listed in subsection (a). The forces or substances identified by 18 Pa.C.S.A. § 3302(a), which defines the offense of causing a catastrophe, include:
explosion, fire, flood, avalanche, collapse of building, release of poison gas, radioactive material or other harmful or destructive force or substance, or by any other means of causing potentially widespread injury or damage....
18 Pa.C.S.A. § 3302(a).
The "any other means of causing potentially widespread injury or damage" is open-ended and not exhaustive. Commonwealth v. Karetny , 583 Pa. 514, 880 A.2d 505, 517 (2005). In the context of this offense, our Supreme Court has held that "risk of catastrophe" regulates those instrumentalities that are capable of causing widespread injury or damage. Commonwealth v. Hughes , 468 Pa. 502, 364 A.2d 306, 312 (1976). "The 'risk' proscribed by the statute is the use of dangerous means by one who 'consciously disregards a substantial and justifiable risk' and thereby unnecessarily exposes society to an extraordinary disaster." Id. at 311.
In the case sub judice , the items seized from the scene at North Railroad Street are not specifically enumerated by the statute. Therefore, if the items are to be substances whose handling can subject an actor to criminal liability for risking a catastrophe, it must be because the actor's "improper handling (of the substance) is capable of causing widespread devastation." Id.
Sergeant DiPalo testified that, when he responded to the scene at North Railroad Street, based on his experience, the bed of the pick-up truck contained items commonly used in the manufacturing of methamphetamine, and the materials are hazardous. He specifically testified the venting process can risk an explosion or fire should the timing be off and the bottles explode. Bottles apparently used in the production of methamphetamine, including those with remnants of the chemical process, were seized from the bed of the pick-up truck. Sergeant DiPalo noted that the items are of such a hazardous nature that the Clandestine Lab Team responded to the scene wearing special chemical fire-resistant suits, heavy gloves, and respirators. The Clandestine Lab Team "deactivated" the bottles and filtered the contents at the scene so as to render the items safe.
Moreover, the backpack recovered from the scene was destroyed because of the toxic and flammable nature of the chemicals, which permeated the backpack. Based on the evidence, the jury was free to reasonably infer that the backpack, which was found in the bushes near the pick-up truck, *302 had been in the pick-up truck prior to the police's arrival. Trinidad , supra .
Moreover, it is undisputed that the pick-up truck, located on North Railroad Street, was in an urban area with sidewalks, numerous vehicles, and multiple buildings nearby. As the trial court indicated, "the items and chemicals used to produce the methamphetamine were either transported in the open bed of a truck from the [subject] cabin location to the North Railroad Street location, or manufactured at the residential North Railroad Street location itself." Trial Court Opinion, filed 11/15/18, at 16. Accordingly, we disagree with Appellant that the evidence was insufficient to demonstrate that the items in the pick-up truck were not handled in such a way as to unnecessarily expose society to an extraordinary disaster. See Hughes , supra .
Furthermore, Appellant contends he was "merely present" at the scene. In rejecting this contention, we initially note Appellant was convicted of conspiracy to commit risking a catastrophe, and as indicated supra , Appellant did not preserve in his court-ordered Pa.R.A.P. 1925(b) statement a sufficiency of the evidence challenge to his conspiracy conviction. It is well-settled that, even if a conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators in furtherance of the conspiracy. Commonwealth v. Lambert , 795 A.2d 1010 (Pa.Super. 2002) (en banc ).
In any event, Appellant was independently liable, as an accomplice, for risking a catastrophe.
[A]n accomplice is someone who, 'with the intent of promoting or facilitating the commission of the offense aids or agrees or attempts to aid [another person] in planning or committing' the crime.
The very nature of accomplice liability is that one who actively and purposefully engages in criminal activity is criminally responsible for the criminal actions of his/her co-conspirators which are committed in furtherance of the criminal endeavor. However, in order to impose this form of criminal liability the individual "must be an active partner in the intent to commit [a crime]." Further, an accomplice "must have done something to participate in the venture." Lastly, "mere presence at the scene is insufficient to support a conviction: evidence indicating participation in the crime is required." Most importantly, the law requires some proof that a party was an active participant in a criminal enterprise in order to impose accomplice liability. Such a finding cannot be based upon mere assumption or speculation.
Id. at 1024 (citations omitted).
Here, viewing the evidence under the applicable standard of review, the evidence reveals Appellant was an active participant in the transporting of the methamphetamine-making items in an urban area. For instance, the evidence reveals Appellant was riding in the bed of the pick-up truck with the visible items when the police stopped it. Also, Detective Minnick testified Appellant admitted to him that he was in Lebanon to show Mr. Leeper, who was driving the pick-up truck, how to manufacture methamphetamine using the "one pot" method, which was consistent with the items found in the pick-up truck. Thus, we reject Appellant's claim that the evidence demonstrates, at most, that he was "merely present."
Consequently, based on the aforementioned and applying the appropriate standard of review, we conclude the jury, as finder of fact, was free to find that Appellant *303 consciously disregarded a substantial and unjustifiable risk with regard to the handling of the items such that he unnecessarily exposed society to an extraordinary disaster. See Commonwealth v. Hoke , 928 A.2d 300 (Pa.Super. 2007), vacated and remanded on other grounds , 599 Pa. 587, 962 A.2d 664 (2009) (holding the evidence was sufficient to support conviction for risking a catastrophe where the defendant engaged in process of cooking methamphetamine at a house and then transported camping fuel and muriatic acid for purpose of continuing production). Thus, we reject Appellant's claim the evidence was insufficient to sustain his conviction for risking a catastrophe under 18 Pa.C.S.A. § 3302(a).
In his second issue, Appellant contends the evidence was insufficient to sustain his conviction for possession with the intent to manufacture methamphetamine under 35 P.S. § 780-113(a)(30) or possession of drug paraphernalia under 35 P.S. § 780-113(a)(32). Appellant does not dispute that the items seized by the police from the pick-up truck were possessed by someone with the intent to manufacture methamphetamine or that the items constituted drug paraphernalia; however, he argues there is no evidence he constructively or actually possessed any of the items. Appellant's Brief at 20-22. Appellant asserts that he was "merely present" at the scene where such items were discovered. Id.
35 P.S. § 780-113(a)(30) provides:
(30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.
35 P.S. § 780-113(a)(32) provides:
(32) The use of, or possession with intent to use, drug paraphernalia for the purpose of planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packing, repacking, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act.
We have held the following:
[P]ossession can be found by proving actual possession, constructive possession, or joint constructive possession. Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction. Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. We have defined constructive possession as conscious dominion, meaning that the defendant has the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be established by the totality of the circumstances.
It is well established that, [a]s with any other element of a crime, constructive possession may be proven by circumstantial evidence. In other words, the Commonwealth must establish facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue. See, e.g., Commonwealth v. Davis , 743 A.2d 946, 953-54 (Pa.Super. 1999) (holding that evidence was sufficient to prove constructive possession *304 over drugs found in common areas of an apartment where the defendant entered the apartment using his own key, and possessed $ 800 in cash on his person, and police recovered [the] defendant's identification badge, size-appropriate clothing, and firearms from a bedroom).
[A] defendant's mere presence at a place where contraband is found or secreted is insufficient, standing alone, to prove that he exercised dominion and control over those items. Thus, the location and proximity of an actor to the contraband alone is not conclusive of guilt. Rather, knowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and, thus, his constructive possession.
If the only inference that the fact finder can make from the facts is a suspicion of possession, the Commonwealth has failed to prove constructive possession. It is well settled that facts giving rise to mere association, suspicion or conjecture, will not make out a case of constructive possession.
Commonwealth v. Parrish , 191 A.3d 31, 36-37 (Pa.Super. 2018) (citations and quotation marks omitted).
Further, for the Commonwealth to prove constructive possession where more than one person has access to the contraband, "the Commonwealth must introduce evidence demonstrating either [the defendant's] participation in the drug-related activity or evidence connecting [the defendant] to the specific...areas where the [contraband was] kept." Commonwealth v. Vargas , 108 A.3d 858, 868 (Pa.Super. 2014) (en banc ) (quotation marks and quotation omitted). As indicated supra , a defendant's "mere presence" at a crime scene, standing alone, is insufficient to prove guilt; however, the jury does not have to ignore the defendant's presence in assessing the evidence of possession. Id. at 869 (holding a defendant's presence at the scene where drugs were being packaged was a probative factor the jury could consider).
In the case sub judice , assuming, arguendo , Appellant did not actually possess any of the prohibited items, we conclude the evidence was sufficient to demonstrate Appellant's constructive possession of the contraband in the bed of the pick-up truck, as well as the contraband in the backpack. See Parrish , supra . Initially, we note the Commonwealth presented ample evidence of Appellant's participation in the scheme to manufacture methamphetamine, including Appellant's confession to Detective Minnick that he was in the area to show Mr. Leeper, who was driving the pick-up truck, how to manufacture methamphetamine with the "one pot" method. As indicated supra , the evidence revealed the "one pot" method utilized items such as those found in the bed of the pick-up truck, and in fact, the evidence revealed the items, some of which contained methamphetamine residue, had already been used to manufacture methamphetamine.
Further, Appellant admitted to Detective Minnick that he had been riding in the bed of the pick-up truck (where contraband was discovered) prior to the officers' arrival at the scene. Moreover, in light of the fact Appellant was the only person found outside of the pick-up truck upon the officers' arrival, the jury was free to infer that Appellant was the person who placed the backpack in the bushes near the pick-up truck. Additionally, Appellant was depicted on a surveillance video stealing Liquid Fire within the days leading up to the stop of the pick-up truck. As Sergeant DiPalo testified, Liquid Fire is a "precursor"
*305 to the manufacturing of methamphetamine.
All of the evidence, together, linked Appellant to the specific area where the illegal contraband was found and was sufficient circumstantial evidence of his possession of the contraband. The jury was, thus, free to reject Appellant's argument that he was merely present at the scene and was oblivious to the drug-manufacturing operation. See Vargas , supra . Accordingly, the evidence was sufficient to establish that Appellant knew about the contraband and had conscious dominion and control over the contraband. See Parrish , supra . Therefore, we reject his sufficiency of the evidence claim.
In his third issue, Appellant contends the jury's verdict is against the weight of the evidence. Specifically, Appellant avers the credible evidence reveals that he was merely present at the scene when the pick-up truck was stopped by the police, and there is no credible evidence connecting him to the cabin.[5]
When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." Commonwealth v. Talbert , 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. Commonwealth v. Hopkins , 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. Talbert , supra .
Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. See id.
Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
Id. at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." Id. (quotation marks and quotation omitted).
Appellant requests that we re-weigh the evidence and assess the credibility of a witness presented at trial, a task that is beyond our scope of review. The jury, as finder of fact, had the duty to determine the credibility of the testimony and evidence presented at trial. See Commonwealth v. Collins , 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). As the trial court relevantly indicated:
The jury was presented with testimony from Sergeant DiPalo, as well as *306 Detective Minnick. It was within the jury's authority to weigh the credibility of all witnesses and all testimony. The jury was also presented with fifty-five (55) exhibits including photos of the [backpack]..., photos of the precursors/purported methamphetamine manufacturing equipment recovered from the North Railroad Street location, photos from the North Londonderry Township cabin, [a] Lab Report, and Stipulations, amongst other exhibits.
[T]he jury was able to weigh all information...and there is nothing to suggest that the jury ignored any relevant testimony and/or information in reaching its verdict. Further, based on all of the evidence presented at the trial, th[e] [trial court] finds the decision rendered by the jury does not shock the [c]ourt's sense of justice.
Trial Court Opinion, filed 11/15/18, at 22.
We agree with the trial court's sound rationale and find Appellant is not entitled to relief on his weight of the evidence claim.
In his final issue, citing to Davis v. Alaska , 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and Pointer v. Texas , 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), Appellant contends he was denied his Sixth Amendment right to confront his accusers. Specifically, Appellant's argument is as follows:
Appellant believes that he was denied his right to be confronted with the witnesses against him, as the Commonwealth only introduced the testimony of Sergeant DiPalo and Detective Minnick and did not present any testimony from his alleged co-conspirators, Kyle Leeper, Crystal Anderson, or Tony Kreider. Appellant attempted to subpoena both Leeper and Anderson for trial but was unable to locate either individual. Although Tony Kreider was incarcerated at the time of trial, the Commonwealth did not call him to testify.
Therefore, Appellant contends that he was denied the right to confront his accusers, in violation of his rights under the 6th Amendment of the Constitution of the United States. Appellant respectfully requests that this Court grant him a new trial because of that violation.
Appellant's Brief at 27.
"Whether a defendant was denied his right to confront a witness under the confrontation clause of the Sixth Amendment is a question of law for which our standard of review is de novo and our scope of review is plenary." Commonwealth v. Tejada , 161 A.3d 313, 317 (Pa.Super. 2017) (citation and brackets omitted).
Our Supreme Court, in Commonwealth v. Yohe , 621 Pa. 527, 79 A.3d 520 (2013), explained the parameters of the Confrontation Clause as follows:
The Confrontation Clause of the Sixth Amendment, made applicable to the States via the Fourteenth Amendment, Pointer , 380 U.S. [at] 403, 85 S.Ct. 1065, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right...to be confronted with the witnesses against him...." In Crawford [v. Washington , 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ], the Court held that the Sixth Amendment guarantees a defendant's right to confront those "who 'bear testimony' " against him, and defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." The Confrontation Clause, the High Court explained, prohibits out-of-court testimonial statements by a witness unless the witness is unavailable and the defendant had a prior opportunity *307 for cross-examination. Id. at 53-56, 124 S.Ct. 1354.
To further elucidate the distinction between testimonial and non[-]testimonial statements, the Court in Davis [v. Washington , 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) ], addressed two types of statements to police and held that whether a statement is testimonial depends on its "primary purpose:"
Statements are non[-]testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Yohe , 79 A.3d at 530-31 (footnotes omitted). The protection of the Confrontation Clause attaches only to testimonial hearsay. Commonwealth v. Williams , 103 A.3d 354 (Pa.Super. 2014) (citation omitted).
In the case sub judice , Appellant has not identified or discussed any out-of-court testimonial statements made by his co-conspirators that were later introduced at trial. Thus, without further development, Appellant has not demonstrated that he is entitled to relief on his final claim.
For all of the foregoing reasons, we affirm.
Affirmed.

35 P.S. § 780-113(a)(30), 35 P.S. § 780-113.1(a)(3), 18 Pa.C.S.A. § 3302(b), 18 Pa.C.S.A. § 903, and 35 P.S. § 780-113(a)(32), respectively.

Sergeant DiPalo testified the iodized salt, when combined with other chemicals, produces a hydrogen generator used in the manufacturing of methamphetamine. Id. at 30.

The trial court noted in its opinion that the photographs taken at the scene depicted "the surrounding area, which included a public street, sidewalk, vehicles, and multiple buildings." Trial Court Opinion, filed 11/15/18, at 16. Appellant does not dispute the trial court's finding. See Appellant's Brief at 18.

To the extent Appellant seeks to challenge on appeal the sufficiency of the evidence as to his conspiracy conviction (risking a catastrophe), 18 Pa.C.S.A. § 903, we note Appellant did not present a challenge to his conspiracy conviction in his court-ordered Pa.R.A.P. 1925(b) statement. See Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

We note Appellant preserved his weight of the evidence claim in his post-sentence motion. See Pa.R.Crim.P. 607(a).