J-S24023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY EDWARD LUCAS | : | |
| | : | |
| Appellant | : | No. 265 WDA 2025 |

Appeal from the Judgment of Sentence Entered August 13, 2024
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0004343-2021

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED:  October 7, 2025**

Anthony Edward Lucas appeals from the judgment of sentence imposed following his convictions for sexual assault and indecent assault.[1] He challenges the sufficiency of evidence to support his convictions. We affirm.

We glean the following facts from the record. At Lucas's jury trial, K.L. testified that on October 31, 2020, she went to her sister's house to go trick-or-treating and carve pumpkins with her six-year-old daughter, her sister ("Kelsey"), and Kelsey's husband. N.T. Trial, 1/9/24, at 32-33. K.L. said that Kelsey was having a gathering at her house that night with a few friends to thank them for their help at her wedding, which was on October 16, 2020. *Id.* at 34. Between 9:00 p.m. and 9:30 p.m., K.L. put her daughter to bed in a bedroom on the first floor of the house, which was near the kitchen and the

---

[1] 18 Pa.C.S.A. §§ 3124.1 and 3126(a)(2), respectively.

bathroom. *Id.* at 35-36. K.L. then joined the party, which consisted of approximately 10 people. *Id.* at 36. K.L. stated that she was drinking alcohol and consumed five to seven beers and two or three shots that night. *Id.* at 37.

K.L. testified that Lucas was at the party. *Id.* Lucas was the brother of Kesley's best friend, Natalie. *Id.* at 38. K.L. had met Lucas two weeks earlier at Kelsey's wedding. *Id.* at 37. K.L. stated that at the wedding, Lucas was dancing with her and wanted to go home with her. *Id.* She told him no and she did not have any other interactions with Lucas until the night of the party. *Id.* at 37-38.

K.L. testified that she was playing beer pong at the party and lost, so she took a shot of alcohol at the end of the game because "whoever lost then took a shot." *Id.* at 38-39. After taking the shot, K.L. "immediately got sick" and went outside to the porch. *Id.* at 39. She stated that she vomited over the railing and urinated her pants. *Id.* She said after her pregnancy, she would urinate herself when she sneezed. *Id.* at 70. When asked if she had ever vomited so hard that she urinated herself in the past, K.L. responded, "Yes, but I've had a kid, so it happens when I sneeze." *Id.* K.L. said that she was not intoxicated at this point but felt "[t]ipsy." *Id.* at 39-40. K.L. stated that she needed a change of pants because she had her period. *Id.* at 40. She told Kelsey that she needed a change of clothes. *Id.* K.L. and Kelsey proceeded to go into the bathroom together, and Kelsey brought K.L. new clothes. *Id.* K.L. testified that she sat down on the toilet and realized she needed a pad, so she

asked Kelsey to retrieve one from her bag that was in the kitchen. *Id.* Kelsey brought K.L. a pad and then left the bathroom without locking the door. *Id.* at 40-41.

K.L. testified that approximately one minute after Kelsey exited the bathroom, Lucas entered the bathroom and shut the door behind him. *Id.* at 42. When Lucas entered the bathroom, K.L. was sitting on the toilet with her pants around her ankles. *Id.* at 42-43. K.L. asked Lucas what he was doing and Lucas "pulled his penis out." *Id.* at 44. Earlier in the night, Lucas told K.L. that they should have sexual intercourse in the bathroom, and K.L. told him "no." *Id.* at 43. After Lucas exposed himself, K.L. said "no" and pushed him away. *Id.* at 44. K.L. testified that Lucas then grabbed her head and put his penis in her mouth while she was still sitting on the toilet. *Id.* at 44-45. K.L. pushed Lucas away and Lucas said, "[L]et me slide it in you." *Id.* at 45. K.L. repeatedly said "no." *Id.* Lucas then got on his knees, pushed K.L. into the back of the toilet, grabbed her legs, and then "stuck his penis inside of" her while grabbing her inner thighs. *Id.* at 45-46. K.L. testified:

> Q. Was [Lucas] using any force when he was pushing on your thighs?
>
> A. Yes.
>
> Q. Okay. Were you trying to keep your legs closed?
>
> A. Yes.
>
> Q. Did [Lucas] engage in intercourse with you?
>
> A. He did.
>
> Q. Did his penis penetrate your vagina?

A. Yes.

Q. Was it the entirety, or only part of it?

A. I have no idea, because I was trying to get him off of me.

Q. Do you know how long this lasted?

A. A few seconds.

Q. Did [Lucas] ejaculate?

A. I am not sure.

Q. Did you try to stop Lucas?

A. I did.

Q. How?

A. I pushed him back into the sink.

Q. Did anything happen[] when you pushed him into the sink?

A. The sink broke. Like, the handle on the sink.

*Id.* at 46-47. The Commonwealth introduced a photograph of the damaged sink handle. *Id.* at 47-48; Commonwealth Exh. 2. K.L. testified that she never consented to any sexual contact with Lucas. N.T. Trial, 1/9/24, at 83.

K.L. testified that after the sink handle broke, Lucas left the bathroom. *Id.* at 48. She said that she did not yell or call for help when she was in the bathroom because her daughter was sleeping in the next room. *Id.* at 48-49. K.L. had bruises on her legs after the incident and the Commonwealth presented photographs of the bruises. *Id.* at 49-52; Commonwealth Exh. 3, 4.

K.L. stated that when she left the bathroom, she saw her friend, Nathaniel Sofranko. N.T. Trial, 1/9/24, at 52. K.L. and Sofranko went onto the

back porch, and she told Sofranko that Lucas had raped her. *Id.* at 53-54. K.L. testified that Kelsey came out on the porch and she told her what had happened. *Id.* at 54. Kelsey called the police, and the police came to the house and interviewed K.L. *Id.* at 55, 74. Kelsey then took K.L. to the hospital where a rape kit was performed. *Id.* at 55, 77.

Sofranko testified that he attended the Halloween party at Kelsey's house on October 31, 2020. *Id.* at 88. He stated that after K.L. left the bathroom, she sat down next to him and "was visibly disturbed in some way, from crying." *Id.* at 94-95. Sofranko testified that he asked K.L. to go out to the back porch to talk and she went outside with him. *Id.* at 95. Sofranko thought K.L. might have been embarrassed from vomiting and having to change her clothes. However, he said he then noticed an irritated scab on her arm and asked her "more seriously what had happened." *Id.* K.L. was crying and told him that Lucas had raped her. *Id.* Sofranko testified that Kelsey came onto the back porch and had a conversation with K.L. *Id.* at 95. He stated that, after the conversation, Kelsey was irate, went back inside, and chased Lucas out of the house. *Id.* at 96.

Kelsey testified that when she saw K.L. walk out of the bathroom, she looked like she had "seen a ghost. Her face was white, like a deer in headlights. Holding back tears." *Id.* at 122-23. Kelsey saw K.L. sit down beside Sofranko and observed them walk outside to the porch. *Id.* at 123. Kelsey said that later that night, she observed that her bathroom "was very disheveled." *Id.* at 124. She noticed that her bathroom rugs were out of place,

- 5 -

the handle to the bathroom sink was bent backwards, and there was blood on the light. *Id.* Kelsey testified that she told Lucas to leave her house, and she called the police. *Id.* at 125.

Trooper Keith Sobecki of the Pennsylvania State Police testified that he received a report in the early morning hours of November 1, 2020, of a sexual assault and was dispatched to Kelsey's house. *Id.* at 152. After he arrived at the residence, Trooper Sobecki interviewed K.L., Kelsey, and Sofranko. *Id.* at 155. Trooper Sobecki testified that their testimony at trial was consistent with what each had told him on the night of the incident. *Id.* Trooper Sobecki said that, later that morning, he picked up the rape kit that was performed on K.L. at the hospital and sent it to the lab for forensic testing. *Id.* at 156-58.

Trooper Sobecki also interviewed Lucas on the night of the incident. *Id.* at 158-59. Lucas told Trooper Sobecki that he had been drinking and "might have said he was buzzed," but he did not think he was intoxicated. *Id.* at 161. Lucas indicated that he went into the bathroom and saw K.L. on the toilet. *Id.* at 162. He told Trooper Sobecki that he then "made out with K.L. and hooked up." *Id.* Lucas said that he inserted his fingers into K.L.'s vagina while K.L. was still on the toilet and then "placed his penis in her mouth and she performed oral sex on him." *Id.* at 162, 164. Lucas told Trooper Sobecki that he attempted to have vaginal intercourse with K.L. *Id.* at 164. Lucas said that his "penis touched [K.L.'s] vagina," but he "denied having sex with her" because "the positioning was making it difficult." *Id.* Lucas said to Trooper Sobecki that "at no point did [K.L.] tell him no" during the incident and that

he "understood what 'no' meant." **Id.** at 163. Trooper Sobecki subsequently obtained a search warrant for Lucas's DNA. **Id.** at 165.

A forensic scientist in the serology section at the Pennsylvania State Police Greensburg Regional Laboratory, Kerri Harkleroad, testified that she received a sexual examination kit in relation to the case. N.T. Trial, 1/10/24, at 11. The kit included a vaginal sample, external genitalia sample, and oral sample, among other things. **Id.** at 12. Harkleroad did presumptive and confirmatory testing on the samples and found no seminal material on the samples. **Id.** at 13-14.

A forensic DNA scientist for the Pennsylvania State Police, Joseph Kukosky, testified that he performed DNA analysis on swabs taken from K.L. and Lucas. **Id.** at 28-30. Kukosky stated that there was a partial DNA profile consistent with a mixture of two individuals that was obtained from the external genitalia swab. **Id.** at 29. He said that the first contributor was K.L. and she was the major DNA contributor since the swab was taken from her body. **Id.** at 29-30. Kukosky testified that Lucas could not be excluded as a second potential contributor to that profile. **Id.** at 31. He opined that "[t]he DNA profile obtained from this item is 2.7 million times more likely than not that it originated from [K.L.] and Anthony Lucas than if it had originated from another from [K.L.] and another unidentified individual." **Id.** In other words, according to Kukosky, the DNA mixture was 2.7 million times more likely to be K.L. and Lucas, than to be K.L. and not Lucas. **Id.** at 31-32.

The defense called one witness at trial, Lucas's sister, Natalie. Natalie was at Kelsey's Halloween party on the night of the incident. *Id.* at 42-44. Natalie had been best friends with Kelsey for 15 years and she asked Kesley if she could bring Lucas to the party. *Id.* at 44-45. Natalie testified that at one point during the party, she attempted to use the bathroom, but the door of the bathroom was closed because somebody was in there. *Id.* at 53. She knocked on the door, and she heard Lucas say, "I'm in here, hold on." *Id.* Natalie said that Lucas partially opened the door and said, "I'll be out," and then closed the door. *Id.* at 53-54. Natalie did not see or hear anybody else in the bathroom with Lucas. *Id.* at 54. About 10 seconds later, Natalie saw Lucas exit the bathroom. *Id.* She said he appeared normal and saw him enter the kitchen. *Id.* at 54-55. Natalie then saw K.L. enter the kitchen after Lucas did. *Id.* at 55. Natalie testified that K.L. did not appear to be upset or crying. *Id.* at 56. Natalie saw K.L. and Sofranko walk outside to the porch. *Id.* at 55-56. Natalie and Lucas followed and went outside to the porch. *Id.* at 56. Once outside on the porch, Natalie was told, without explanation, that she could stay but Lucas had to leave. *Id.* at 57. Natalie and Lucas then got into Natalie's car, and they went home. *Id.* at 59.

At the conclusion of the trial, the jury found Lucas guilty as set forth above. *Id.* at 126. The court sentenced Lucas to a term of 12 months less one day to 23 months of incarceration. Lucas did not file post-sentence motions. This appeal followed.

Lucas raises the following issues:

> 1. Whether the Commonwealth adduced sufficient evidence to satisfy each of the elements of sexual assault?
>
> 2. Whether the Commonwealth adduced sufficient evidence to satisfy each of the elements of indecent assault?

Lucas's Br. at 5.

Lucas's issues challenge the sufficiency of the evidence.[2] The sufficiency of the evidence is a question of law. Therefore, "[o]ur standard of review is *de novo*, and our scope of review is plenary." *Commonwealth v. Mikitiuk*, 213 A.3d 290, 300 (Pa.Super. 2019). When reviewing a challenge to the sufficiency of the evidence, we "must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt." *Commonwealth v. Feliciano*, 67 A.3d 19, 23 (Pa.Super. 2013) (*en banc*) (citation omitted). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." *Id.* (citation omitted). This standard applies equally

---

[2] To the extent Lucas's arguments can be construed as challenging the jury's crediting of K.L.'s testimony and the significance the jury assigned it, his arguments go to weight, not sufficiency. Lucas waived any weight challenge here at least by failing to include any such claim in his statement of questions involved. *See* Pa.R.A.P. 2116(a). Insofar as his arguments contend that because of the deficiencies he perceives in K.L.'s testimony, the evidence did not add up to proof beyond a reasonable doubt, he has stated a proper sufficiency challenge. *See Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000); *Commonwealth v. Knox*, 219 A.3d 186, 198 (Pa.Super. 2019).

where the Commonwealth's evidence is circumstantial. ***Commonwealth v. Patterson***, 180 A.3d 1217, 1229 (Pa.Super. 2018).

This Court "may not substitute [its] judgment for that of the factfinder." ***Commonwealth v. Griffith***, 305 A.3d 573, 576 (Pa.Super. 2023). The factfinder, "while passing on the credibility of the witnesses and the weight of the evidence – is free to believe all, part, or none of the evidence." ***Commonwealth v. Miller***, 172 A.3d 632, 640 (Pa.Super. 2017). A "complainant's testimony alone is sufficient to sustain a conviction for a criminal offense, 'so long as that testimony can address and, in fact, addresses, every element of the charged crime.'" ***Commonwealth v. Horlick***, 296 A.3d 60, 62 (Pa.Super. 2023) (quoting ***Commonwealth v. Johnson***, 180 A.3d 474, 481 (Pa.Super. 2018)).

Lucas first challenges the sufficiency of the evidence to support his conviction for sexual assault. He argues that the Commonwealth's evidence relied almost exclusively on the uncorroborated testimony of K.L., who was under the influence of alcohol to the point of vomiting and urinating on herself. Lucas's Br. at 10, 12. Lucas maintains that even though K.L. admitted that she consumed seven to 10 alcoholic beverages, she "claimed she was not intoxicated and could presumably recall the events of October 31, 2020 with verity." ***Id.*** at 12. He also points out that K.L. could not state whether the alleged penetration "was in full or in part." ***Id.*** at 13.

Lucas further emphasizes that the vaginal, external genital, and oral samples from the rape kit did not contain the presence of semen. ***Id.*** He also

notes that Natalie testified that she observed nothing unusual and Lucas exited the bathroom 10 seconds after Natalie attempted to open the door. *Id.*

Sexual assault is defined in the Crimes Code as:

> Except as provided in section 3121 (relating to rape) or 3123 (relating to involuntary deviate sexual intercourse), a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent.

18 Pa.C.S.A. § 3124.1.

"Sexual intercourse" is defined as "[i]n addition to its ordinary meaning, includ[ing] intercourse per os or per anus, with some penetration however slight; emission is not required." 18 Pa.C.S.A. § 3101. "Deviate sexual intercourse" is defined as "[s]exual intercourse per os or per anus between human beings and any form of sexual intercourse with an animal." *Id.* It "also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." *Id.*

Here, the trial court determined the evidence was sufficient to sustain Lucas's conviction for sexual assault. It explained:

> A review of the evidence in this case, read in the light most favorable to the verdict-winner, demonstrates that [Lucas] engaged in sexual intercourse or deviate sexual intercourse with [K.L.] without her consent. [K.L.] testified that, while she was sitting on a toilet in the bathroom, [Lucas] walked into the bathroom, shut the door, took out his penis, grabbed [K.L.'s] head and inserted his penis into her mouth. [K.L.] testified that, while she was still sitting on the toilet, [Lucas] knelt down, pushed her back, grabbed her

- 11 -

legs, inserted his penis inside of her, and engaged in intercourse. [K.L.] testified that she pushed [Lucas] back into the sink, which broke the handle on the sink.

[K.L.] testified consistently that she did not consent to sexual contact with [Lucas], and told him "no" repeatedly when he performed sexual acts on her while they were in the bathroom. There is no evidence in the record that [K.L.] consented to sexual contact with [Lucas].

Rule 1925(a) Opinion, filed 4/7/25, at 8-9 (citations omitted). The court further noted that K.L. testified that she sustained bruises as a result of the incident and the photographs of K.L.'s bruises corroborated her testimony. *Id.* at 9. The court also emphasized that the DNA evidence supported Lucas's conviction for sexual assault. *Id.* at 10.

Based on our review of the record, and viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we find no error in the court's conclusion that the Commonwealth presented sufficient evidence that Lucas committed sexual assault. K.L. unequivocally testified that Lucas orally and vaginally penetrated her without her consent. This was sufficient to establish penetration. That K.L. could not testify whether the penetration was partial or full does not make the evidence insufficient. The statute provides that penetration can be "however slight" and "[p]enetration need not reach the vagina or farther reaches of female genitalia." *In re A.D.*, 771 A.2d 45, 49 (Pa.Super. 2001) (*en banc*) (citation omitted). Further, the testimony of a sexual assault victim, if believed by the fact-finder, as it was here, is sufficient to support the verdict. *See Commonwealth v. Charlton*, 902 A.2d 554, 562 (Pa.Super. 2006); *Horlick*, 296 A.3d at 62. The jury obviously found the

- 12 -

victim's testimony credible. It was within the province of the jury as fact-finder to resolve all issues of credibility. ***Miller***, 172 A.3d at 640.

Moreover, there was corroborating evidence supporting K.L.'s testimony. Both Sofranko and Kelsey testified that K.L. was visibly shaken and upset after she left the bathroom. Sofranko testified that very shortly after K.L. left the bathroom, she told him on the porch that Lucas had just raped her. Kelsey testified that her bathroom was disheveled and the handle to the bathroom sink was bent backwards. The DNA taken from K.L.'s external genitalia swab confirmed that the DNA mixture was 2.7 million times more likely to be K.L. and Lucas than to be K.L. and somebody else. The evidence was sufficient to establish the elements of sexual assault.

Lucas next argues that the evidence was insufficient to support his conviction for indecent assault. In this claim, Lucas essentially makes the same argument that he made in support of his first issue. ***See*** Lucas's Br. at 15-17.

Indecent assault is defined in the Crimes Code, in pertinent part, as follows:

> **(a) Offense defined.--**A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and . . .
>
> (2) the person does so by forcible compulsion[.]

18 Pa.C.S.A. § 3126(a)(2).

"Indecent contact" is defined as "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S.A. § 3101. "Forcible compulsion" is defined as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." *Id.*

The trial court found the Commonwealth presented sufficient evidence for the jury to find beyond a reasonable doubt that Lucas was guilty of indecent assault. *See* Rule 1925(a) Op. at 10. The court did not err. As set forth above, K.L. testified that Lucas walked into the bathroom, pulled out his penis, grabbed her head, and put his penis in her mouth. He then pushed her to the back of the toilet, grabbed her legs, and vaginally penetrated her. The jury evidently found K.L.'s testimony credible. Based on our review of the record and viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we find no error in the court's conclusion that the Commonwealth presented sufficient evidence that Lucas was guilty of indecent assault.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

J-S24023-25

DATE: <u>10/07/2025</u>