J-A05040-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ROBERT MAYS | : | |
| | : | |
| Appellant | : | No. 352 EDA 2020 |

Appeal from the Judgment of Sentence Entered May 2, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002270-2017,
CP-51-CR-0002271-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ROBERT MAYS | : | |
| | : | |
| Appellant | : | No. 353 EDA 2020 |

Appeal from the Judgment of Sentence Entered May 2, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002270-2017,
CP-51-CR-0002271-2017

BEFORE:   OLSON, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    Filed: May 13, 2021

Appellant, Robert Mays, appeals from the judgment of sentence entered

in the Court of Common Pleas of Philadelphia County after a jury found him

guilty of multiple sex offenses committed against two minor girls with whom

---

[*] Former Justice specially assigned to the Superior Court.

he lived. On appeal, he contends the verdict was against the weight of the evidence and challenges several evidentiary rulings made by the court. We affirm.

This case arose from Appellant's persistent sexual abuse of his girlfriend's daughters and niece in the family home during their pre-teen and early teenage years. Appellant, who was in his mid-twenties at the relevant times, was the live-in boyfriend of P.T., and prior to committing the offenses in question, he had gained the love and respect of P.T.'s three daughters, son, and niece by assuming a dependable parental role in their lives when P.T. was often less reliable. At Appellant's February 2019 trial, however, the girls lamented over how they lost this stable presence in their lives when Appellant's behavior changed from caring and protective to harassing, lewd, and predatory.

The trial court opinion aptly sets forth the pertinent testimonies given at Appellant's trial on charges that he abused two of the four girls in his care, as follows:

> As a child, [witness] N.T.M lived with her twin sister [], brother, mother, and Appellant . . . in Philadelphia. [In 2015, when N.T.M. was in sixth grade] [t]hey moved to [a different Philadelphia neighborhood]. *Id.* at 2/11/19 at 42. N.T.M.'s younger sister, Complainant M.T.M., resided with her grandmother but would spend weekends at [N.T.M's] house. *Id.* at 62.
>
> Shortly after moving to [their new residence], N.T.M. came home one evening and Appellant was the only one there. *Id.* at 47. Appellant was naked and approached [ ] N.T.M., asking her if she thought his penis was larger than a can of air freshener. *Id.* at 48. Over the next several weeks, Appellant continued to expose

himself to N.T.M., as well as to her friends when they were over at the house. *Id.* 49-52, 55.

[According to N.T.M,] in the weeks following these incidents, [she] would wake up with her underwear pushed down and Appellant in her bed attempting, often successfully, to perform oral sex on her . . . or penetrating her vagina with his penis. *Id.* at 57-61. N.T.M. [testified that] she often observed Appellant perpetrating similar sex acts against her twin sister [ ], who shared a room with her. *Id*. N.T.M. also [testified that she] observed Appellant attempting to sexually assault her cousin, [S.T.], in a similar manner when [S.T.] would sleep over the house. . . . *Id.* at 75. [N.T.M also claimed] Appellant continued to force N.T.M. into various sex acts for approximately two years. *Id.* at 61.

[Complainant S.T. testified that] Appellant also had an "uncle like" role in her life. N.T., 2/12/19, at 16. S.T. would occasionally come to the [new residence] occupied by Appellant . . . to visit her [younger] cousins[,] . . . staying for an entire summer in 2015 and sharing a bedroom with [the twin sisters]. *Id.* at 12. S.T. was 14 or 15 years old [that] summer. . . . *Id.* at 17. [According to S.T.], [a]lmost every day that summer, Appellant would come into the girls' bedroom and expose his penis to S.T. and often to her cousins in the room. *Id.* at 20. On one occasion, Appellant came up behind S.T. in the kitchen and pressed his erect penis against her and asked, "Do you think you're ready now. You think you would be able to handle me." *Id.* at 22. On a separate occasion, Appellant approached S.T. when she was sitting down and touched her vaginal area, telling her "your pussy is fat." *Id.* at 23. Appellant would often tell S.T. what he wanted to do to her sexually, or how he wanted to have sex with her. *Id.* at 26.

Complainant [M.T.M.] is the [youngest] sister[, and though] initially [she] lived with her grandmother, separate from her siblings, she would visit her sisters, mother, and Appellant at their home . . . when she was [between 11 and 13 years old]. *Id.* at 115-117. Appellant showed M.T.M. a photograph of his penis and asked her if it should be his screen saver. *Id.* at 117-118. [M.T.M. testified that in] a separate incident, when M.T.M. was asleep in her sisters' bedroom, Appellant entered the room and penetrated her vagina with his fingers and touched her breasts. *Id.* at 125.

[M.T.M. claimed that on] another occasion, Appellant entered the bedroom and forcefully penetrated M.T.M.'s vagina with his penis.

*Id.* at 135. On multiple occasions, [she maintained], Appellant also attempted to force his penis into her mouth. *Id.* at 137, 152. [M.T.M. testified that] Appellant continued to rape her multiple times [both when she visited and later when she moved in with the family.] *Id.* at 137-142. On multiple occasions[, M.T.M. recounted,] Appellant would also put his penis through a door knob hole in the [family's first home], exposing himself to her if she was in the room on the other side of the door. *Id.* at 144.

[At the conclusion of Appellant's jury trial before the Honorable Mia R. Perez,] with respect to Complainant M.T.M., Appellant was found guilty of unlawful contact with a minor as a felony in the first degree, solicitation to commit involuntary deviate sexual intercourse with a child as a felony in the first degree, endangering the welfare of a child as a felony in the third degree, and corrupting the morals of a minor. [He was acquitted of charges of rape of a child and aggravated indecent assault of a person less than 13 years of age.]

With respect to Complainant S.T., Appellant was found guilty of unlawful contact with a minor as a felony in the third degree, [endangering the welfare of children through a course of conduct,] corrupting the morals of a minor, and indecent assault without consent.

On May 2, 2019, with respect to Complainant M.T.M., Appellant was sentenced . . . to four to 16 years of state incarceration for unlawful contact with a minor, a consecutive period of four to eight years for solicitation to commit involuntary deviate sexual intercourse with a child, and concurrent terms of nine to 16 months for endangering the welfare of a child and nine to 16 months on corrupting the morals of a minor, for an aggregate sentence of twelve to twenty-four years of state incarceration.

With respect to Complainant S.T., Appellant was sentenced to one to two years of incarceration for unlawful contact with a minor, and concurrent sentences of nine to 16 months for indecent assault without consent and nine to 16 months for corrupting the morals of a minor, for an aggregate sentence of one to two years of state incarceration.

Appellant's total aggregate sentence as to both Complainants [M.T.M and S.T.] was thirteen to twenty-six years of state incarceration.

Trial Court Opinion, 7/29/2020, at 1-4.

Appellant timely filed his notices of appeal on January 16, 2020, and he submitted a court-ordered Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal on February 7, 2020. In response, the trial court filed its Rule 1925(a) opinion addressing the issues raised.

In Appellant's brief, he raises one issue challenging the weight of the evidence and three related issues asserting that the court erred in sustaining Commonwealth objections to various questions asked of the witnesses during cross-examination. Initially, however, we must determine whether we are required to quash the present appeal.

Appellant has filed two counseled notices of appeal, with each one listing two trial court docket numbers. On January 29, 2020, this Court issued rules to show cause why the appeals should not be quashed pursuant to Pa.R.A.P. 341(a) and *Commonwealth v. Walker*, 185 A.3d 969 (Pa. June 1, 2018). Specifically, in *Walker*, the Pennsylvania Supreme Court mandated "that when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed," and the failure to do so will result in quashal of the appeal. *Id.* at 977.

On January 30, 2020, counsel for Appellant filed a response to each rule to show cause. On February 3, 2020, and February 4, 2020, this Court entered orders withdrawing the rules to show cause, but it informed the parties that the issue raised in the rules to show cause will be referred to the panel assigned to decide the merits of the appeals.

In reviewing this issue, we rely on two recent *en banc* decisions of this Court. In **Commonwealth v. Jerome Johnson**, 236 A.3d 1141 (Pa. Super. 2020) (*en banc*), the Court held that the filing of multiple notices of appeal, with each one listing all court of common pleas docket numbers, does not, alone, require quashal under **Walker**. **Jerome Johnson**, 236 A.3d at 1148. (partially overruling **Commonwealth v. Creese**, 216 A.3d 1142 (Pa. Super. 2019) to the extent **Creese** erroneously interpreted **Walker** and Pa.R.A.P. 341 as requiring quashal under such circumstances).

**Commonwealth v. Rebecca Johnson**, 236 A.3d 61 (Pa. Super. 2020) (*en banc*), also involved the filing of three notices of appeal that each listed all three docket numbers of the court of common pleas. Taking guidance from its recent decision in **Jerome Johnson**, the Court observed that its sole inquiry was "whether [appellant Rebecca Johnson] complied with **Walker**— *i.e.*, whether she actually filed separate notices of appeal for each docket number of the court of common pleas." **Rebecca Johnson**, 236 A.3d at 66.

Proof that she fulfilled this requirement, the Court concluded, lay in the different timing and location of the time stamps on each notice of appeal. Specifically, the Court noted that while two of the notices included the same time stamp, the stamps appeared on different locations of each notice, and the third notice had a different time stamp altogether. **Id**. Thus, the Court concluded the appellant Rebecca Johnson complied with **Walker** by filing "three separate notices for each lower-court docket number." **Id**.

Reviewing the present record under this precedent, we find the notices of appeal in the instant case, like those in **Commonwealth v. Rebecca Johnson**, contain different time stamps reflecting that separate notices of appeal for each docket number of the court of common pleas were filed. Therefore, Appellant's filing of the two separate notices of appeal bearing both trial court docket numbers adequately conveyed to this Court that the two dockets were implicated, thus signaling that separate appellate docket numbers were required.

Consequently, we retain the ability to exercise discretion to consolidate the appeals pursuant to Pa.R.A.P. 513, which was one of the purposes cited by the **Walker** Court for requiring that separate appeals be filed for each implicated docket. **See Walker**, **supra** at 976 (holding that Rule 341(a) must be read consistently with the Rules 512 and 513 governing joint appeals, and that the filing of a single notice of appeal from an order arising on more than one docket effectively consolidated appeals without either the approval of the Superior Court or the agreement of the appellees as required in Rule 513). For these reasons, we find the filing of two separate notices of appeal herein sufficient under **Walker**, and we decline to quash these appeals.

Turning, then, to Appellant's first issue, we see that he contends the trial court erred when it denied his post-sentence motion seeking a new trial on the argument that his convictions were against the weight of the evidence. Support for his claim, he maintains, is found in the aggregate of N.T.M.'s prior false allegation in an unrelated sexual assault case, the sisters' contradictory

testimonies regarding the extent of Appellant's actions against S.T., character witness testimony as to Appellant's reputation for non-violence, the lack of physical evidence of sexual abuse, M.T.M's assertion to police that another man was responsible for the crimes against her, and the jury's acquittal on the charges of rape and aggravated sexual assault.

In reviewing a challenge to the weight of the evidence, the trial judge will not overturn a verdict unless it is "so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Diggs*, 949 A.2d 873, 879 (Pa. 2008). Our subsequent review, as an appellate court, does not involve analysis of whether the verdict is against the weight of the evidence, but is constrained to a determination of an abuse of discretion by the trial court. *Commonwealth v. Wall*, 953 A.2d 581, 586 (Pa. Super. 2008) (citations omitted).

"Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." *Commonwealth v. Antidormi*, 84 A.3d 736, 758 (Pa. Super. 2014) (quoting *Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa.2013)). As such, a trial court's decision as to whether a verdict was or was not against the weight of the evidence is one of the least assailable of its rulings. *Diggs*, 949 A.2d at 879-80.

"The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." **Commonwealth v. Champney**, 832 A.2d 403, 408 (Pa. 2003) (citation omitted). "Issues of witness credibility include questions of inconsistent testimony and improper motive." **Commonwealth v. Jacoby**, 170 A.3d 1065, 1080 (Pa. 2017) (citation omitted). "A new trial should not be granted because of a mere conflict in the testimony[.]" **Clay**, 64 A.3d at 1055.

It is well-settled that, "[i]n a prosecution for sex offenses, a verdict may rest on the uncorroborated testimony of the victim." **Commonwealth v. Cody**, 584 A.2d 992, 993 (Pa. Super. 1991) (case citation omitted). **See also**, **Commonwealth v. Diaz**, 152 A.3d 1040, 1047 (Pa. Super. 2016) (holding sexual assault victim's uncorroborated testimony, if believed by the jury, is sufficient to convict, despite contrary evidence from defense witnesses). As provided in Section 3106 of the Crimes Code, "[t]he testimony of a complainant need not be corroborated in prosecutions under this chapter[, Sexual Offenses]." 18 Pa.C.S.A. § 3106.

Appellant's challenge to the weight of the evidence suffers from an argument that rests on a mere listing of the above-stated reasons for a new trial without developing a detailed discussion supported by favorable precedent. Rather than deem his challenge waived for briefing deficiencies, however, we elect to address several aspects to his truncated claim and

elucidate how they fail to show how the jury's credibility determinations shock the conscience.

Appellant first characterizes N.T.M. as an unreliable witness to his alleged acts because once, as an eleven year-old alleged victim of rape, she lied about the age of the young assailants who had lured her away from a neighborhood block party and into a home where the sexual offenses occurred. Specifically, on cross-examination, N.T.M. acknowledged that when she returned home bleeding and crying, she falsely claimed her rapists were two unidentified, older men because she did not want to get the actual assailants in trouble. N.T. 2/11/19 at 88-95, 99. Her lie was revealed months later when DNA testing of her rape kit sample from CHOP was matched with a younger male who did not correlate with her initial account. N.T. at 99-100.

Consequently, police showed her a photo array from which she identified the male responsible for the alleged rape, but she indicated she did not want charges filed. N.T. at 102. As far as she knew at the time of the present trial, the rape investigation had been discontinued. N.T. at 102. Because of this falsehood N.T.M. told as an eleven-year-old victim, Appellant contends the jury could not reasonably credit her testimony regarding his alleged activities in the family home.

Appellant also states that the witnesses' conflicting testimonies concerning Appellant's conduct toward S.T.—with N.T.M. testifying she witnessed Appellant having sex with S.T. in the girls' bedroom, and S.T.

denying she ever had sex with Appellant—further required the jury to discredit the sum of such evidence.

Specifically, S.T. testified she rejected two unwelcome sexual advances initiated by Appellant during the summer when, as a then 14-year-old girl, she lived with her aunt and cousins. The first took place in the kitchen, when a fully-clothed Appellant approached S.T. from behind and rubbed his erect penis against the back of her shorts while asking if she was ready for him and could handle him. N.T., 2/12/19, at 22. The second took place in the girls' bedroom, where Appellant had entered uninvited in his customary manner, placed his hand between S.T.'s legs as she sat on a bed wearing a pair of shorts, and bit his bottom lip for effect while exclaiming her "pussy was fat." N.T. at 23.

S.T. testified that she shared with her twin cousins what Appellant had done to her, and the three girls eventually relayed the story to P.T. and S.T.'s mother in late 2015. N.T. at 29-30. S.T. subsequently told a DHS caseworker about the incident during an interview. N.T. at 33-38. On cross-examination, S.T. stated that she had not seen Appellant touch the other girls inappropriately, but she witnessed him speak inappropriately to them. N.T. at 48.

S.T.'s mother testified that after receiving a call from P.T. and DHS, S.T. shared with her the allegations of Appellant's voyeurism and inappropriate language and touching. S.T.'s mother explained S.T. required therapy for depression she experienced from the events. N.T. at 82-90.

- 11 -

As noted above, "[r]esolving contradictory testimony and questions of credibility are matters for the factfinder," **Commonwealth v. Mikitiuk**, 213 A.3d 290, 305 (Pa. Super. 2019) (citation omitted), and the uncorroborated testimony of a sexual assault victim, if deemed credible, is enough to support a conviction. **Cody**, **supra**.

In assessing Appellant's post-sentence motion, the trial court acknowledged such precedent and concluded that the jury, acting in its province as sole finder of fact, was permitted to credit S.T.'s testimony regarding Appellant's criminal actions notwithstanding either impeachment evidence directed at N.T.M.'s credibility or inconsistent testimony to the extent N.T.M. alleged that S.T. actually endured more severe abuse from Appellant than S.T. was willing to confirm.

Indeed, the trial court considered how, at trial, S.T. unequivocally testified in explicit detail how Appellant repeatedly engaged in sexual conduct and commentary with the girls while she lived with them. According to her testimony, Appellant would walk into the girls' bedroom daily and expose himself while asking questions like, "Are you ready?" and "Do you like this?" N.T. 2/12/19 at 21. She testified similarly regarding Appellant's unlawful touching of her. Her mother testified that S.T. shared these accounts with her.

In the same way, the trial court assessed the jury's guilty verdicts on charges relating to M.T.M.'s alleged sexual abuse and determined they were not contrary to the evidence. Specifically, Appellant notes summarily that

M.T.M admitted at trial that when she was 12 or 13 years old, she initially gave interviews, conducted by the Philadelphia Children's Alliance under observation by Special Victims Unit, in which she stated that she had been abused not by Appellant but, instead, by a male cousin. N.T. at 156-157.

The record shows, however, that M.T.M., who was 16 at the time of trial, testified that she gave the interviews in question while she was still living with Appellant and her mother, P.T., and she had simply obeyed P.T.'s command that she lie to authorities about the identity of her assailant. N.T. at 156-157, 172. She explained that when she moved to live with S.T. and S.T.'s mother, she gave her first truthful interview accusing Appellant of abusing her. N.T. at 162.

On cross-examination, M.T.M. admitted that she never saw Appellant sexually abuse the other girls. N.T. at 193-94. She also admitted that even after moving in an abuse-free home with S.T. and S.T.'s mother, she ran away from home for a number of days and was eventually placed in a foster home. N.T. at 220-222. The jury, therefore, observed vigorous cross-examination of M.T.M and considered impeachment and other evidence relating to her inconsistent statements about the identity of her assailant, and it deemed her accusation of Appellant credible with respect to most charges.[1]

_____

[1] Regarding Appellant's contention that the jury's split verdict on charges relating to M.T.M. bears favorably on his weight of the evidence claim, we note that "[f]ederal and Pennsylvania courts alike have long recognized that jury acquittals may not be interpreted as specific factual findings with regard to
*(Footnote Continued Next Page)*

Based on this record, trial court concluded:

> Here, the jury was presented with the consistent, credible, and compelling testimony of both S.T. and M.T.M., as well as that of prior bad acts witness N.T.M., that Appellant systematically abused both Complainants. Both Complainants recalled specific wording of statements the Appellant made during the course of the abuse, the timing and location of the incidents and specific details such as Appellant's clothing. [N.T., 2/12/19, at 12-26 (as to Complainant S.T.), 115-144 (as to Complainant M.T.M.). Appellant was given a full and fair opportunity to cross-examine all witnesses to elicit additional testimony for the factfinder. And despite Appellant's presentation of character witnesses and fact witnesses who attempted to dispute the evidence offered by the Commonwealth, the jury chose to believe each complainant's testimony regarding Appellant's sexually abusive behavior. . . . [T]here was nothing about this [jury's] verdict that would shock one's sense of justice. Thus, Appellant is not entitled to relief on this claim.

TCO at 6 (unenumerated).

In light of this record, we find no abuse of discretion in the trial court's discernment that the jury's guilty verdicts did not shock the conscience. As such, Appellant's weight of the evidence claim fails.

As to Appellant's remaining issues pertaining to the trial court's evidentiary rulings, we note the following standard of review:

---

the evidence, as an acquittal does not definitively establish that the jury was not convinced of a defendant's guilt." *Commonwealth v. Moore*, 103 A.3d 1240, 1246 (Pa. 2014) (citations and quotation marks omitted). *See also Commonwealth v. Miller*, 35 A.3d 1206, 1209 (Pa. 2012) ("[T]he fact that the inconsistency [in the verdict] may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable.") (citation omitted). As such, the trial court properly rejected this argument, as well.

Questions concerning the admissibility of evidence are within the sound discretion of the trial court[,] and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment[ but, rather, is] the overriding or misapplication of the law, or the exercise of judgment[,] that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record. If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused[,] and it is the duty of the appellate court to correct the error.

*Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa. Super. 2020) (citation omitted), *appeal denied*, 244 A.3d 1222 (Pa. 2021).

"Relevance is the threshold for admissibility of evidence."

*Commonwealth v. Tyson*, 119 A.3d 353, 358 (Pa. Super. 2015) (*en banc*), *appeal denied*, 633 Pa. 787, 128 A.3d 220 (2015).

Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or tends to support a reasonable inference or proposition regarding a material fact. Relevant evidence may nevertheless be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Commonwealth v. Danzey*, 210 A.3d 333, 342 (Pa. Super. 2019), *appeal denied*, ––– Pa. ––––, 219 A.3d 597 (2019) (internal quotation marks omitted).

Appellant first contends that the court erred when it sustained a Commonwealth objection "as to the reasons that Complainant(s) were removed from the home where the crimes allegedly occurred because the

- 15 -

implication was that Complainant(s) were removed because of Appellant. . . . Appellant suffered irreparable harm because removal could be seen [as] attributable to Appellant when this was not the case." Brief for Appellant, at 17. We disagree.

The ruling to which Appellant refers was issued during the cross-examination of N.T.M., who had already testified that she was removed from the home and placed in foster care for reasons having nothing to do with Appellant. In her own words, N.T.M. explained her removal was "not because of anything with [Appellant]," but because she "was getting suspended from school," "fighting," "doing a lot of stuff that [she] wasn't supposed to," and because DHS had made a finding of parental "abandonment." N.T., 2/11/19, at 105-109. She testified that she had run away from foster care to live with another family for three years, and voiced her frustration with being placed in foster care without authorities knowing how circumstances at her family home contributed to her disruptive and combative behaviors:

> **DEFENSE COUNSEL:** So, they [the other family] were okay with you staying with them even though you weren't supposed to be?
>
> **N.T.M.:** Yes.
>
> **Q:** And you were a minor?
>
> **A:** Sorry. The person that I stay with wouldn't just want to see nobody on the street, like cold or nothing like that, that way.
>
> **Q:** But you didn't have to be on the street?
>
> **A:** Yes, I did. I didn't have to be in placement neither because I didn't have – why should I have to be in placement if I was

- 16 -

getting touch on at home, and I'm angry because I was getting touched on at home, and I'm outside fighting and being disrespectful because I was getting touch on at home? Why should I have to go into placement for that? Why? They – Why?

**Q:** You were being what in the house?

**A:** I was being touched on, you know, raped, liked that way, touched.

**Q:** But that's not why you were taken out of the home?

**PROSECUTOR:** Objection.

**DEFENSE COUNSEL:** [asking N.T.M.] You said that before?

**THE COURT:** Sustained, [counsel].

**N.T.M.** I never said that's why I was taken out of the home.

**DEFENSE COUNSEL:** I know, but now you're saying—

**THE COURT:** Ms. [N.T.M.], I sustained the objection. You don't have to answer the question.

N.T., 2/11/19, at 173.

This record shows that N.T.M. had conveyed previously to the jury that the official reasons for her removal from the family home had nothing to do with Appellant. Moreover, she reaffirmed this position by responding, "I never said that's why I was taken out of the home[,]" despite the court's ruling sustaining the Commonwealth's objection.

Therefore, even assuming, *arguendo*, that the court erroneously sustained the objection, no prejudice resulted,[2] as the jury heard N.T.M.'s

---

[2] Regarding harmless error, we have observed:
*(Footnote Continued Next Page)*

answer to defense counsel's question seeking reaffirmance of her previous testimony, and the court did not strike the answer from the record.

Next, Appellant contends the court erred in sustaining the Commonwealth's objections to cross-examination seeking to expound on N.T.M.'s behavioral problems at school. Specifically, the evidentiary ruling occurred as defense counsel sought testimony from S.T. regarding N.T.M.'s behavior while she was living with S.T. and S.T.'s mother:

> **DEFENSE COUNSEL:** Okay. And did anything happen that you know of that you saw in your house that involved [N.T.M.]?
>
> **S.T.:** No.
>
> **Q:** No. She was having problems, school problems, behavioral problems.
>
> **[PROSECUTOR]:** Objection.
>
> **THE COURT:** Sustained.
>
> **DEFENSE COUNSEL:** Did she listen to your mom, if your mom told her what to do or not to do?

---

> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* or (2) the erroneously admitted [or precluded] evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted [or precluded] evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Hawkins*, 701 A.2d 492, 507 (Pa. 1997).

[PROSECUTOR]:     Objection.

THE COURT:     Sustained.

N.T., 2/12/19, at 57.

According to Appellant, N.T.M.'s behavioral issues could have been related to "another initially-named suspect,"[3] and cross-examination could have revealed fabricated allegations against Appellant "especially because of the markedly different testimony of N.T.M., who had a prior false report of rape, and S.T." with respect to their testimonies regarding sex versus "mere touching[.]" Appellant's brief, at 20.

Appellant fails to develop this argument regarding another "initially-named suspect" any further, nor does he address how he was prejudiced by the court's ruling where the jury already had learned about N.T.M.'s false report in the unrelated rape investigation, her prior misbehaviors in school, and the difference between her and S.T.'s testimonies regarding the extent of sexual abuse experienced by S.T.   This incomplete argument, therefore, precludes meaningful appellate review.  **_See Commonwealth v. Knox_**, 50 A.3d 732, 748 (Pa. Super. 2012) (holding that an appellant's failure to cite legal authority in support of his argument results in waiver); **_see also_** Pa.R.A.P. 2119(a) (requiring that an argument section contain discussion and citation of pertinent authorities).

---

[3] The "initially-named suspect" was N.T.M.'s male cousin, whom M.T.M. falsely identified as her assailant, pursuant to P.T.'s command.

In Appellant's final challenge to the courts' evidentiary rulings, he posits that the court improperly precluded cross-examination of N.T.M. and M.T.M. about whether they and Appellant's other accusers were "using drugs" during the time they lived with Appellant. N.T., 2/11/19, at 110; 2/12/19, at 59-60, 196. Because drug use could have affected their ability to perceive and remember events accurately, Appellant maintains, the question was appropriate, making the court's ruling reversible error.

The Commonwealth counters that the trial court correctly excluded such testimony as unduly prejudicial because it would improperly "'divert the jury's attention away from its duty of weighing the evidence impartially,' . . . and would instead focus its attention on the witnesses' supposed misbehavior or drug use rather than whether in fact Appellant had sexually abused them." Brief of Appellee, at 25-26. (quoting **Commonwealth v. Dillon**, 925 A.2d 131, 136 (Pa. 2007)). The trial court concurs with the Commonwealth, opining that the admission of any drug use "would have only served as an attempt to paint the Complainant in a negative light at trial." TCO, at 10 (unenumerated).

Upon review of the record, we conclude Appellant has failed to establish any evidentiary foundation for the proposition that the witnesses, who were between the ages of 11 and 15 at the relevant times, were in any way incapable of observing, perceiving, or recollecting Appellant's conduct that served as a basis for the charges against him. To the contrary, the detailed testimony of each complainant, as discussed above in our disposition of

Appellant's weight of the evidence claim, reflected a clear memory and firm understanding of what they had experienced in Appellant's company.

To have permitted cross-examination as to whether the girls were using drugs at the time Appellant lived with them would have diverted the focus of trial inappropriately away from Appellant's alleged conduct and onto the personal lives of the alleged victims. The trial court considered the evidence that had been admitted to that point in trial and concluded that the probative value of defense counsel's requested line of questioning was outweighed by the risk of unfair prejudice. *See Dillon*, *supra*. We discern no abuse of discretion in this ruling.

For the foregoing reasons, we deem Appellant's issues meritless, and we affirm judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/13/21

- 21 -