J-S20020-22

2022 PA Super 116

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JEFFREY DEAN MCFARLAND :
:
Appellant : No. 204 WDA 2022

Appeal from the Judgment of Sentence Entered September 21, 2020
In the Court of Common Pleas of Blair County
Criminal Division at CP-07-CR-0000943-2018

BEFORE:  NICHOLS, J., MURRAY, J., and KING, J.

OPINION BY MURRAY, J.:                    **FILED:  June 29, 2022**

Jeffrey Dean McFarland (Appellant) appeals from the judgment of sentence imposed after a jury found him guilty of unlawfully manufacturing a controlled substance (MCS) and criminal conspiracy.[1]  We affirm.

The trial court detailed the relevant facts as follows:

> Officer Philip Worthy [(Officer Worthy)] is employed by the Altoona Police Department and is a member of the West Drug Task Force.  During the course of his employment, Officer Worthy [learned] that methamphetamine can be manufactured using a one-pot method, using a two liter bottle.  During the course of his employment, Officer Worthy [learned] that pseudoephedrine is a main ingredient of manufacturing methamphetamine. Pseudoephedrine is typically distributed in blister packets [purchased at pharmacies or retail stores; this over-the-counter medication is commonly used to treat seasonal allergy and cold symptoms].  Other items [that] can be used for manufacturing methamphetamine are: [lithium] batteries, camp fuel, muriatic acid, funnels, and coffee filters.

---

[1] 35 P.S. § 780-113(a)(30); 18 Pa.C.S.A. § 903(a)(1).

On March 5, 2018, Officer Worthy responded to 2827 Pine Avenue, Altoona, PA, with deputies from the Blair County Sheriff's Office for attempted warrant service on Shawn Amick and Mary Blackie. Upon arrival at the residence, [which was owned by Mary Blackie,] Officer Worthy observed Shawn Amick through a window in the kitchen area of the home. Shawn Amick attempted to leave the residence through the back door once police knocked. This resulted in a brief foot pursuit through the home. Upon entering the living room, Officer Worthy observed Mary Blackie[, Appellant, and his brother/co-defendant,] Randy McFarland [(McFarland) (We collectively refer to Appellant and McFarland as "Defendants").] …

Once Mary Blackie and Shawn Amick were secured, Officer Worthy noted, in plain sight, a glass smoking pipe consistent with smoking methamphetamine, empty blister packets, [lithium] batteries, and a Mountain Dew bottle with a white crystal substance inside it. The Defendants were seated on chairs [in the living room] near Mary Blackie and the coffee table. The pipe, empty blister packs, and batteries were on the coffee table directly in front of the Defendants …. The Mountain Dew bottle with the white crystal contents was on the floor at the feet and in between Mary Blackie and one of the Defendants. Officer Worthy observed this to be within arm's reach of both Defendants and Mary Blackie. Other officers conducted a protective sweep of the residence for any additional parties and upon doing so, made additional observations of items in plain sight, in various areas of the house, which were suspected of [being used to] manufactur[e] methamphetamine consistent with the one-pot method.

As a result of the observations, Pennsylvania State Police Clandestine Lab was notified and responded to the house. The Clandestine Team concluded that the residence contained a methamphetamine production lab using the one[-]pot method.

To purchase pseudoephedrine, an ingredient of the one-pot manufacturing method, a buyer must show a government issued identification and provide a signature to the pharmacy. The information provided by the buyer, such as name, address, and date of birth, as well as the date, time, brand, and amount of purchase is logged by the pharmacy into a database, known as

the National Precursor Log Exchange (NPLEX).[2]  The system limits the amount of pseudoephedrine that can be purchased [by an individual] during a specific period of time.

Officer Worthy identified the NPLEX logs for Mary Blackie, as well as for [Appellant] and [] McFarland[.  Officer Worthy conducted the NPLEX database searches approximately one week after March 5, 2018.]  The logs contained purchases made from 2014 to March 5, 2018.  The NPLEX log (Commonwealth Exhibit 1) reveals:

(a) On November 26, 2017, [Appellant] attempted a purchase of Wal-Phed in a 24, a 48, and a 96 count box at 4:34 pm and 4:35 pm[.  Wal-Phed contains pseudoephedrine].  He was subsequently blocked from purchasing the items because he exceeded the 9 gram limit within 30 days.  This purchase was attempted at the East Plank Road Walgreens.

(b) On November 26, 2017, Mary Blackie successfully purchased a 96 count of Wal-Phed at the same Walgreens store at 4:42 pm.

(c) On January 4, 2018, [Appellant] was blocked from purchasing a 10 count box of pseudoephedrine at 10:47 am at Dick's Pharmacy in Altoona, Pennsylvania.

(d) On this same date, Mary Blackie bought a 10 count box of pseudoephedrine from the same pharmacy at 11:09 am.

(e) On January 28, 2018, Mary Blackie bought a 10 count box of pseudoephedrine at 10:13 am at the Walgreens on East Plank Road in Altoona[,] while [Appellant] was blocked from making this same purchase at 10:21 am.

(f) On February 5, 2018, Mary Blackie purchased a 20 count box of pseudoephedrine at 8:35 pm[.  Appellant] made the same purchase at the same store at 8:36 pm.

_____

[2] The trial court explained NPLEX is a "web-based database [that] enables retailers to enter sales data pursuant to the federal Combat Methamphetamine Epidemic Act of 2006.  21 C.F.R. Part 1314."  Trial Court Opinion, 9/18/19, at 12.

(g) On February 19, 2018, [Appellant] purchased a 20 count box of pseudoephedrine at 4:22 pm at Walgreens located on East Plank Road in Altoona, Pennsylvania.

(h) At 4:28 pm on the same date, Mary Blackie purchased a 10 count box of pseudoephedrine at 4:29 pm at the same store.

(i) A comparison of the NPLEX logs for [Appellant] and [] McFarland reveal that on March 2, 2018, both individuals purchased pseudoephedrine at the Walgreens on East Plank Road in Altoona, Pennsylvania. [Appellant] purchased a 10 count box at 7:42 pm while [McFarland] purchased a 14 count box at 7:49 pm.

The NPLEX logs list numerous purchases and attempted purchases by [Appellant and McFarland; the logs also contained Defendants' respective dates of birth and driver's license numbers]. Looking at the time frame of January of 2017 through March 2, 2018, Commonwealth Exhibit 1 shows 28 successful purchases and 17 blocked purchases by [Appellant]. All but one of these purchases and attempts at purchase took place at various pharmacies in Altoona. During the same time frame, [McFarland] made 17 purchases and had 12 purchases that were blocked.

A consolidated preliminary hearing for both Defendants was held on May 23, 2018, before the Honorable Magisterial District Judge Benjamin Jones; Officer Worthy testified at said preliminary hearing [as the only witness]. During cross examination, the officer confirmed that the home located at 2827 Pine Avenue, Altoona [(the Pine Avenue house)] is owned by Mary Blackie. The Officer testified that [Appellant] lives at 608 Six Mile Run Road in Defiance, PA. There was no evidence found by the officer to indicate [Appellant] was living at the Pine Avenue house. Officer Worthy admitted that [Appellant and McFarland] did not look impaired on the evening of March 5, 201[8], when the officer encountered them at the Pine Avenue house. Officer Worthy stated [Appellant and McFarland] had no methamphetamine paraphernalia [or other contraband] on their person. The Officer did testify that [McFarland] had approximately three-thousand five-hundred dollars ($3,500.00) in US currency on his person when an inventory of [his] possessions was taken at the Altoona Police Department.

Trial Court Opinion, 9/18/19, at 2-7 (footnote added; citations, paragraph numbering, and some spacing omitted).

At the close of the preliminary hearing, Judge Jones held for court most of the charges against Appellant.[3] On November 26, 2018, Appellant filed an omnibus pretrial motion (OPT Motion) seeking, *inter alia*, suppression of his NPLEX log. **See** OPT Motion, 11/26/18, at ¶¶ 20-21, 26-27 (asserting Officer Worthy did not secure a search warrant or court order before obtaining the NPLEX log, which contained Appellant's private, protected health information). Appellant's OPT Motion also sought dismissal of all charges. He claimed the Commonwealth had failed to establish a *prima facie* case where the evidence established he was merely present at the Pine Avenue house and unaware of the drug manufacturing operation.

The trial court held a suppression hearing on May 24, 2019. After the hearing, the court ordered the parties to file memoranda of law on the suppression issue. Order, 5/24/19, at 1-2. The court specifically directed the

_____

[3] In addition to MCS and conspiracy, the Commonwealth charged Appellant with recklessly endangering another person (REAP), 18 Pa.C.S.A. § 2705; risking catastrophe, *id.* § 3302(b); possessing precursor substances with intent to unlawfully manufacture a controlled substance, 35 P.S. § 780-113.1(a)(3); possessing esters, salts, or isomers with intent to manufacture a controlled substance, *id.* § 780-113.1(a)(4); possession of a controlled substance (PWID), *id.* § 780-113(a)(16); possession of drug paraphernalia, *id.* § 780-113(a)(32); and operating a methamphetamine laboratory near a school, *id.* § 780-113.4(a)(3). At the preliminary hearing, Judge Jones dismissed the charges of REAP, risking catastrophe, and PWID, finding the Commonwealth failed to establish a *prima facie* case.

parties to address a prior opinion authored by a separate Blair County Court of Common Pleas Judge in the analogous case of **Commonwealth v. Babcock**, CR-403-2012 (**Babcock**), where the court addressed whether police required a warrant to conduct an NPLEX search.

The Commonwealth claimed in its memorandum of law that **Babcock** was directly on point and **Babcock**'s holding – that no warrant is necessary to conduct an NPLEX search – applied to Appellant's case. **See** Memorandum of Law, 6/21/19, at 16 (**Babcock** "had a very similar factual pattern to the present case as law enforcement located a methamphetamine lab in Mr. Babcock's residence"; and "President Judge Elizabeth A. Doyle opined that law enforcement did not need a warrant to examine the NPLEX logs, as the information contained in such documents was not personal information that created a heightened expectation of privacy."). In his memorandum of law, Appellant argued **Babcock** is contrary to precedent. Memorandum of Law, 7/24/19, at 7 (unnumbered).

By opinion and order entered September 18, 2019, the trial court denied Appellant's OPT Motion. The case proceeded to trial in February 2020. The jury found Appellant guilty of MCS and conspiracy, and not guilty of the remaining charges. On June 29, 2020, the trial court imposed an aggregate sentence of 3 - 24 months of incarceration, followed by two years of probation.

On July 8, 2020, the Commonwealth filed a post-sentence motion for reconsideration. It claimed the trial court erred in failing to sentence Appellant

to the statutory mandatory minimum sentence – two years of incarceration – pursuant to 35 P.S. § 780-113(k) (mandatory minimum sentence for persons convicted of MCS or related manufacturing offenses).

On July 13, 2020, Appellant filed a post-sentence motion challenging the verdicts as being against the weight of the evidence. Appellant further claimed the jury's verdicts were not supported by sufficient evidence, and the trial court erred in failing to suppress the NPLEX logs.

The trial court held a hearing on the parties' post-sentence motions on September 21, 2020. The court granted the Commonwealth's motion and re-sentenced Appellant, pursuant to 35 P.S. § 780-113(k), to an aggregate two to four years in prison, followed by two years of probation. Order, 9/21/20. The court denied Appellant's post-sentence motion.

This timely appeal followed. Appellant and the trial court complied with Pa.R.A.P. 1925. Appellant presents three issues for our consideration:

I.  Whether the court erred in not granting the motion to suppress and allowing the admission of the NPLEX precursor log tracking system search and search results[?]

II.  Whether the interests of justice entitle the Appellant to have the jury's verdict vacated as it was against the sufficiency of the evidence[?]

III.  Whether the interests of justice entitle the Appellant to have the jury's verdict vacated as it was against the weight of the evidence[?]

Appellant's Brief at viii (reordered; some capitalization altered).

Appellant first argues the trial court abused its discretion in denying his OPT Motion where police failed to obtain a search warrant or court order to conduct the NPLEX search. *See id.* at 5-11. Appellant contends: "Because there is a reasonable expectation of privacy in the information provided to the NPLEX, law enforcement is required to obtain a search warrant to access these records[.]" *Id.* at 10. Appellant also claims the federal Health Insurance Portability and Accountability Act, 45 C.F.R. § 160.101 *et seq.* (HIPAA), protects against disclosure of "health information," *see id.* § 160.103, and the information contained in Appellant's NPLEX log constitutes "health information." *See* Appellant's Brief at 8-10.

The Commonwealth rejects Appellant's claim, arguing that the police lawfully obtained Appellant's NPLEX log without a warrant:

> The information contained in these logs is basic identification which is not such personal information that warrants a heightened expectation of privacy. Further, this information is only kept in the log for over the counter medicines. It is not utilized when someone obtains medicine via a prescription from a licensed physician, which may constitute a medical record that requires a warrant. The Commonwealth avers that the only basis for someone to be concerned about privacy with respect to his or her purchases of pseudoephedrine is if he or she was obtaining the item for an illegal purpose. This concern for privacy would not be as strong for someone who is obtaining pseudoephedrine to use [it] for its intended purpose of treating the common cold or seasonal allergies. Notably, the logs kept in the NPLEX database are not medical records that require law enforcement to obtain a warrant.

Commonwealth Brief at 37. The Commonwealth also correctly observes our appellate courts have "yet to determine that law enforcement needs a warrant

in order to conduct a search of the information contained within the [NPLEX] database." *Id.* at 35-36.

Our standard of review applicable in challenges to the denial of an OPT motion

> is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (citations omitted). When a defendant files a motion to suppress evidence, "it is the Commonwealth's burden to present evidence that the defendant's constitutional rights were not infringed." *Commonwealth v. Enimpah*, 106 A.3d 695, 701 (Pa. 2014).

"The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures." *Commonwealth v. Anderson*, 2022 PA Super 95, at * 19 (Pa. Super. 2022) (*en banc*) (citation omitted). "Under the Fourth Amendment, searches and seizures without a warrant are presumptively unreasonable, subject only to specifically established

exceptions." ***Commonwealth v. Wilmer***, 194 A.3d 564, 568 (Pa. 2018) (citation and quotations omitted); ***see also Commonwealth v. Heidelberg***, 267 A.3d 492, 502 (Pa. Super. 2021) (*en banc*) ("As a general rule, a warrant stating probable cause is required before a police officer may search for or seize evidence." (citation and quotations omitted)). The Pennsylvania Constitution's protections are broader than those of the United States Constitution in this regard. ***Commonwealth v. Alexander***, 243 A.3d 177, 202 (Pa. 2020). Our Supreme Court has explained:

> A search occurs when police intrude upon a constitutionally protected area without the individual's explicit or implicit permission. To constitute such an intrusion, the action need not uncover something "of great personal value"; even a small, seemingly insignificant act of information gathering by police in a constitutionally protected area is a search.

***Commonwealth v. Fulton***, 179 A.3d 475, 487-88 (Pa. 2018) (citations omitted).

Where, as here, our appellate courts have not yet determined the scope of protection afforded under the Fourth Amendment and Article I, Section 8, we employ a two-part test: "That test requires a person to (1) have established a subjective expectation of privacy[;] and (2) have demonstrated that the expectation is one that society is prepared to recognize as reasonable and legitimate." ***Commonwealth v. Duncan***, 817 A.2d 455, 463 (Pa. 2003) (citation omitted)). "The expectation of privacy is an inquiry into the validity of the search or seizure itself; if the defendant has no protected privacy interest, neither the Fourth Amendment nor Article I, § 8 is implicated."

- 10 -

***Enimpah***, 106 A.3d at 699. "In determining whether a person's expectation of privacy is legitimate or reasonable, we must consider the totality of the circumstances and the determination ultimately rests upon a balancing of the societal interests involved." ***Commonwealth v. Kane***, 210 A.3d 324, 330 (Pa. Super. 2019) (citation and quotations omitted).

In this case, the trial court determined Appellant's NPLEX log was properly admitted without a warrant, reasoning:

> NPLEX is the Real Time Stop Sale system used in Pennsylvania. The Real Time Stop Sale system is defined at 35 [P.S. §] 780-102 as follows:
>
>> "Real-time stop-sale system" means a system intended to be used by **law enforcement agencies** and pharmacies or other business establishments that:
>>
>> (1) is installed, operated and maintained free of any one-time or recurring charge to the business establishment or to the Commonwealth;
>>
>> (2) is able to communicate in real time with similar systems operated in other states and similar systems containing information submitted by more than one state;
>>
>> (3) complies with the security policy of the Criminal Justice Information Services Division of the Federal Bureau of Investigation or its successor;
>>
>> (4) complies with information exchange standards adopted by the National Information Exchange Model or its successor;
>>
>> (5) uses a mechanism to prevent the completion of a sale of a product containing ephedrine or pseudoephedrine that would violate Federal or State law regarding the purchase of a product containing those substances; and

(6) is equipped with an override of the mechanism that:

(i) may be activated by an employee of a business establishment; and

(ii) creates a record of each activation of the override.

[*Id.*] (emphasis added).

The Controlled Substance, Drug, Device and Cosmetic Act (35 P.S. [§] 780-101 *et seq.*) establishes at Section 780-113.6, a system for tracking retail sales of ephedrine or products containing pseudoephedrine. Act 53 of 2013 (House Bill 602) was approved by the Governor on July 9, 2013, and became effective April 5, 2014. Pennsylvania requires that retailers limit the sale of pseudoephedrine to certain amounts and to record for each purchase: (1.) the name[ and] address of the purchaser; (2.) the name and quantity of the product purchased; (3.) the date and time of the purchase; and (4.) the purchaser's identification, type, and number, plus the purchaser's signature in the logbook. 35 P.S. § 780-113.6(c). "The vendor of the real-time stop-sale system shall forward State transaction records in the real-time stop-sale system to the department weekly and provide real-time access to the real-time stop-sale system information through the system's online portal to law enforcement in this Commonwealth as authorized by the department." 35. P.S. § 780-113.6(f). The term "department" is defined at 35 P.S. [§] 780-102 to be the Department of Health for the Commonwealth. The retailer is also required to submit the above referenced information to a real-time stop-sale system in order to assure that the purchaser is not making a purchase above the prescribed limits. 35 P.S. § 780-113.6(d). **The collected data is viewable by law enforcement in keeping with both the federal law and the corresponding PA statute.**

The NPLEX database tracks sales of over-the-counter cold and allergy medications containing precursors to the illegal drug, methamphetamine. … HIPAA[] regulates the use and disclosure of health information. The term "health information" is defined at 45 CFR [§] 160.103. In part, the definition states that health information:

(2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health

- 12 -

care to an individual; or the past, present, or future payment for the provision of health cans to an individual.

[*Id.*]

The information collected and contained in the NPLEX database is not "health information" such that i[t] comes under the jurisdiction of the Privacy Rule under HIPAA. **The information being gathered by retail pharmacies is not health care information. It is retail purchase information.** It does not speak to a past, present or future physical or mental health condition that is specific to the purchaser. **The** [**NPLEX**] **data simply demonstrates that on a particular date and time, and at a particular location, the identified individual purchased, or attempted to purchase an *over-the-counter* medication**.

The Defendants could have no reasonable expectation of privacy where each allegedly entered a public business and requested an over-the-counter medication which could either be used to treat legitimate physical ailments or could be used to manufacture illegal substances. In doing so, the **Defendants would have each *voluntarily* produced a form of identification with name, address, and date of birth to procure the requested substance.** Lastly, each Defendant would have supplied a signature. Further, the **Defendants could have no reasonable expectation of privacy** in records of the aforementioned information kept by the pharmacy and logged into the NPLEX.

Trial Court Opinion, 9/18/19, at 12-15 (emphasis added; paragraph numbering and some spacing omitted). We agree with and adopt the trial court's cogent reasoning and determination. We are also persuaded by the Commonwealth's argument that "the only basis for someone to be concerned about privacy with respect to his or her purchases of pseudoephedrine is if he or she was obtaining the item for an illegal purpose." Commonwealth's Brief at 37.

Although our research discloses no Pennsylvania appellate decision on point, we are persuaded by the reasoning of the Blair County Court of Common Pleas in **Babcock**, **supra**, which involved nearly identical facts. **See Commonwealth v. Anderson**, 40 A.3d 1245, 1249 n.5 (Pa. Super. 2012) ("We recognize that decisions of the Court of Common Pleas are not binding precedent; however, they may be considered for their persuasive authority." (citation omitted)). The trial court in **Babcock** ruled that law enforcement does not need to secure a search warrant before obtaining NPLEX database results of an individual's purchase history (and attempted purchase history) of over-the-counter (OTC) pseudoephedrine from a pharmacy,[4] for the following reasons:

> [**Mr. Babcock,**] **in** … **open business hours of a public business, walked into** [**the pharmacy**] **in full view of every member of the public and requested an over-the-counter substance** that could either be used to treat minor ailments, such as allergies, or could be used to manufacture illegal controlled substances[. **Mr. Babcock also**] **voluntarily gave his personal information to procure such substances**. The Court finds that there is no expectation of privacy in such action by an individual and no expectation of individual privacy in any record voluntarily kept by a pharmacy in that situation. In fact, the Court almost deems it a consent to search, that [Mr. Babcock] voluntarily provided the information he provided [to purchase pseudoephedrine, *i.e.*, his name, date of birth, and driver's license]. … [T]he Court is not going to protect a privacy interest of people who come into retail establishments seeking to purchase substances which are not prescribed for them by a licensed physician …, but also may be used to manufacture controlled substances to the detriment of the general public.

_____

[4] OTC medications, unlike prescription medications, are dispensed in **labeled boxes publicly indicating their contents**.

Order, 9/7/12, at 1-2 (emphasis added).

We conclude the cogent reasoning of the court in **Babcock** is equally applicable to the instant appeal. There is no merit to Appellant's claim that **Babcock** is contrary to precedent. Furthermore, federal courts have ruled that law enforcement is not required to secure a search warrant to obtain NPLEX results.[5] **See**, **e.g.**, **May v. Strain**, 55 F. Supp. 3d 885, 898-99 (E.D. La. 2014) ("Neither the Court nor, apparently, the parties can locate any authority showing a clearly established constitutional privacy right that prohibits law enforcement from accessing an individual's OTC records" of pseudoephedrine purchases and attempted purchases).

Based on the foregoing, Appellant has no protected privacy interest in the NPLEX search results, and thus "neither the Fourth Amendment nor Article I, § 8 is implicated." **Enimpah**, **supra**; **cf. Commonwealth v. Shaw**, 770 A.2d 295, 299 (Pa. 2001) ("The right to privacy extends to medical records of patients."). Finally, we note that Appellant, for the first time on appeal, argues the admission of his NPLEX log violated his constitutional right to confront witnesses against him. **See** Appellant's Brief at 7-8. Our Supreme Court has instructed, "it is axiomatic that issues not raised in lower courts are waived

---

[5] **See Rudalavage v. PPL Elec. Utils. Corp.**, 268 A.3d 470, 479 n.7 (Pa. Super. 2022) ("Where we are unable to find Pennsylvania precedent, we may look to federal case law for its persuasive value." (citation and quotations omitted)).

for purposes of appellate review, and they cannot be raised for the first time on appeal." ***Trigg v. Children's Hosp. of Pittsburgh***, 229 A.3d 260, 269 (Pa. 2020) (citing Pa.R.A.P. 302(a)). Accordingly, Appellant waived this argument.[6] As the trial court did not abuse its discretion in declining to suppress the NPLEX log, Appellant's first issue does not merit relief.

In his second issue, Appellant contends the Commonwealth failed to present sufficient evidence to convict him of MCS and conspiracy beyond a reasonable doubt. ***See*** Appellant's Brief at 1-3. Appellant claims the "[e]vidence failed to establish that [he] possessed a controlled substance; therefore, evidence was not sufficient" to support his convictions. ***Id.*** at 2-3. Appellant further argues his "three and a half year purchase history of pseudoephedrine was at no time during the trial shown to be directly connected to this one particular incident." ***Id.*** at 3.

We first address whether Appellant preserved this claim. It is settled that to "preserve a sufficiency claim, the Rule 1925(b) statement must specify the element or elements upon which the evidence was insufficient."

_____

[6] Even if not waived, we would determine this argument lacks merit. We are persuaded by the reasoning of other state appellate courts in ***State v. Cady***, 425 S.W.3d 234, 247 (Mo. Ct. App. 2014) (concluding, "Because the NPLEX records are not testimonial in nature, Defendant's right of confrontation was not violated, and the trial court did not err in admitting the NPLEX records."), and ***People v. Linnartz***, 2020 WL 6228285, at \*\*2-3 (Mich. Ct. App. 2020) (same); ***see also Commonwealth v. Arthur***, 62 A.3d 424, 429 n.9 (Pa. Super. 2013) (this Court may consider decisions from other state courts for their persuasive value).

*Commonwealth v. Widger*, 237 A.3d 1151, 1156 (Pa. Super. 2020). If the appellant does not specify such elements, the sufficiency claim is deemed waived. *Commonwealth v. Roche*, 153 A.3d 1063, 1072 (Pa. Super. 2017). Here, Appellant, in his court-ordered Rule 1925(b) statement, raised a boilerplate challenge to the sufficiency of the evidence that did not specify the element or elements for which the evidence was insufficient. *See* Rule 1925(b) Statement, 2/17/22, at 1 (unnumbered) (stating, "There was insufficient evidence to convict the Defendant in this case."). Given this deficiency, Appellant waived his sufficiency issue. *See Roche*, *supra*.

Waiver notwithstanding, the sufficiency challenge would lack merit. We are mindful of the following:

> When reviewing a sufficiency of the evidence claim, this Court must view the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the Commonwealth as verdict winner, and we must determine if the evidence, thus viewed, is sufficient to prove guilt beyond a reasonable doubt. This Court may not substitute its judgment for that of the factfinder. If the record contains support for the verdict, it may not be disturbed. Moreover, a jury may believe all, some or none of a party's testimony.

*Commonwealth v. Burns*, 765 A.2d 1144, 1148 (Pa. Super. 2020) (citations omitted). "The Commonwealth may sustain its burden by means of wholly circumstantial evidence[.]" *Commonwealth v. Brown*, 48 A.3d 426, 430 (Pa. Super. 2012).

The Crimes Code defines conspiracy, in relevant part, as follows:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its

commission he … agrees with such other person or persons that they … will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime[.]

18 Pa.C.S.A. § 903(a)(1).  We have instructed:

Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to establish that a defendant was part of a conspiratorial agreement to commit the crime.  There needs to be some additional proof that the defendant intended to commit the crime along with his co-conspirator.  Direct evidence of the defendant's criminal intent or the conspiratorial agreement, however, is rarely available.  Consequently, the defendant's intent as well as the agreement is almost always proven through circumstantial evidence, such as by the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators.

***Commonwealth v. Dunkins***, 229 A.3d 622, 633 (Pa. Super. 2020) (citation omitted).  Once "the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy, regardless of which co-conspirator committed the act." ***Commonwealth v. Dixon***, 2022 PA Super 96, *10 (Pa. Super. 2022) (citation and brackets omitted).

With respect to MCS, the Controlled Substance, Drug, Device and Cosmetic Act (the Act) provides:

Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, … or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance [is prohibited].

35 P.S. § 780-113(a)(30).  The Act defines "manufacture," in relevant part, as "the production, preparation, propagation, compounding, conversion or

- 18 -

processing of a controlled substance, other drug or device or the packaging or repackaging of such substance or article[.]" *Id.* § 780-102.

In "narcotics possession cases, the Commonwealth may meet its burden by showing actual, constructive, or joint constructive possession of the contraband." ***Commonwealth v. Vargas***, 108 A.3d 858, 868 (Pa. Super. 2014) (*en banc*) (citation omitted). Instantly, as the contraband was not recovered from Appellant's person, the Commonwealth had to establish his constructive possession or joint constructive possession. ***Commonwealth v. Roberts***, 133 A.3d 759, 767 (Pa. Super. 2016).

> Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as "conscious dominion." We subsequently defined "conscious dominion" as "the power to control the contraband and the intent to exercise that control." To aid application, we have held that constructive possession may be established by the totality of the circumstances.

*Id.* at 767-68 (citation omitted). Constructive possession may be proven by circumstantial evidence. ***Commonwealth v. Mikitiuk***, 213 A.3d 290, 303 (Pa. Super. 2019).

Appellant claims the "evidence presented at the trial established only that [he] was merely present at the house where Shawn Amick and Mary Blackie were manufacturing controlled substances." Appellant's Brief at 1-2. The "law is clear that a defendant cannot be convicted of a crime where the

only evidence to connect him with the crime is 'mere presence' at or near the scene." ***Commonwealth v. La***, 640 A.2d 1336, 1344 (Pa. Super. 1994).

> A defendant's mere presence at a place where contraband is found or secreted is insufficient, standing alone, to prove that he exercised dominion and control over those items. Thus, the location and proximity of an actor to the contraband alone is not conclusive of guilt. Rather, knowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and, thus, his constructive possession. If the only inference that the fact finder can make from the facts is a suspicion of possession, the Commonwealth has failed to prove constructive possession. It is well settled that facts giving rise to mere association, suspicion or conjecture, will not make out a case of constructive possession. Further, for the Commonwealth to prove constructive possession where more than one person has access to the contraband, the Commonwealth must introduce evidence demonstrating either the defendant's participation in the drug-related activity or evidence connecting the defendant to the specific ... areas where the contraband was kept.

***Mikitiuk***, 213 A.3d at 304 (citations, quotations, and brackets omitted).

In ***Mikitiuk***, police responded to a parked pick-up truck in which appellant had been a passenger, upon receiving tips from confidential informants that illegal drug activity was occurring in the truck. ***Id.*** at 294. Upon arrival, police saw appellant standing outside of the truck. ***Id.*** Police recovered from both the truck, and a backpack on the ground nearby, several items and precursors consistent with manufacturing methamphetamine using the "one-pot" method, including plastic bottles, coffee filters, and pseudoephedrine. ***Id.*** at 294-95. On appeal, the appellant raised a sufficiency challenge to his convictions of, *inter alia*, MCS and conspiracy. We rejected the claim, reasoning as follows:

[T]he evidence reveals appellant was an active participant in the transporting of [] methamphetamine-making items in an urban area. For instance, the evidence reveals appellant was riding in the bed of the pick-up truck with the visible items when the police stopped it. Also, [the arresting officer] testified Appellant admitted to him that he was in Lebanon to show Mr. Leeper, who was driving the pick-up truck, how to manufacture methamphetamine using the "one pot" method, which was consistent with the items found in the pick-up truck. …

* * *

Moreover, in light of the fact appellant was the only person found outside of the pick-up truck upon the officers' arrival, the jury was free to infer that appellant was the person who placed the backpack in the bushes near the pick-up truck. … All of the evidence, together, linked appellant to the specific area where the illegal contraband was found and was sufficient circumstantial evidence of his possession of the contraband. The jury was, thus, free to reject appellant's argument that he was merely present at the scene and was oblivious to the drug-manufacturing operation. Accordingly, the evidence was sufficient to establish that appellant knew about the contraband and had conscious dominion and control over the contraband. Therefore, we reject his sufficiency of the evidence claim.

*Id.* at 302, 305 (citations and some capitalization omitted).

In this case, Officer Worthy described to the jury the information contained in the respective NPLEX logs, which showed the extensive purchase history (and unsuccessful attempts to purchase) pseudoephedrine by Appellant, McFarland, and Mary Blackie. *See* N.T., 2/4/20, at 115-131; N.T., 2/5/20, at 7-8. Officer Worthy testified that several of the purchases/attempts occurred on the same day, sometimes within minutes of each other, and/or at the same pharmacy. N.T., 2/4/20, at 123 ("[Appellant] purchased pseudoephedrine at the same pharmacy, the same Walgreens

pharmacy as had Mary Blackie on numerous occasions and as did []
McFarland. … [Appellant] purchased or attempted to purchase 21 times at
the pharmacy and [] McFarland attempted four purchases at that same
pharmacy."); *see also id.* at 127-28. Officer Worthy testified, "of the eight
pharmacies [Appellant] utilized, he had 69 total purchases or attempted
purchases." *Id.* at 125. Officer Worthy explained pseudoephedrine is the
"main active ingredient in most methamphetamine labs[.]" *Id.* at 102; *see
also* N.T., 2/5/20, at 14 (testimony of Jason Harner (Harner), an expert in
the field of forensic science, that pseudoephedrine is a crucial ingredient in
manufacturing methamphetamine via the one-pot method).

Officer Worthy further testified that he arrived at the Pine Avenue house
on March 5, 2018, knocked on the door, and attempted to serve the arrest
warrants for Shawn Amick and Mary Blackie. *See* N.T., 2/4/20, at 99-100,
107. Once inside the house, Officer Worthy saw Appellant and McFarland
seated on chairs in the living room, near Mary Blackie. *Id.* at 101, 132-33.
Officer Worthy saw, in plain view, a two-liter soda bottle on the floor near
Appellant and McFarland. *Id.* at 100-01, 133. Officer Worthy stated the
"green two liter soda bottle that was on the floor [] we presumed to be a one-
pot laboratory." *Id.* at 101. A separate officer involved in the raid of the Pine
Avenue house, Corporal Justin Bennett (Corporal Bennett), testified that the
green two-liter bottle contained a "crystal-like white substance," which, based
on Corporal Bennett's training and experience, was consistent with

methamphetamine manufactured via the one-pot method. *Id.* at 37-38; *see also* N.T., 2/5/20, at 17-18 (Harner testifying, "the items in this case contain all of the ingredients required to manufacture methamphetamine using the one-pot method. … [T]he manufacture of methamphetamine using the one-pot method was attempted and was successful."). Officer Worthy testified the two-liter bottle was within the reach of Appellant and McFarland. N.T., 2/4/20, at 134. Officer Worthy also observed other items in plain view in the house that were consistent with manufacturing methamphetamine, including muriatic acid, lithium batteries, and blister packets of pseudoephedrine. *See id.* at 103-05, 141-42; *see also id.* at 34 (Corporal Bennett testifying the Pine Avenue house contained "multiple bottles [] filled with different fluids and miscellaneous [] chemicals …[;] it was very messy"). Finally, Officer Worthy testified McFarland had approximately $3,500 in cash on his person, which, in the officer's training and experience, was consistent with engaging in illicit drug trafficking. *Id.* at 147, 150; *see also id.* at 69 (testimony from police officer who discovered the cash on McFarland's person at the Altoona Police Department).

We conclude this evidence, properly viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to establish Appellant's constructive possession of the contraband, and his conspiratorial agreement with McFarland. Contrary to Appellant's claim, the Commonwealth produced more evidence of his guilt than his mere presence at the Pine Avenue house;

namely, the Defendants' respective NPLEX logs, the large amount of cash found on McFarland's person, and the two-liter bottle containing methamphetamine residue that police found within Appellant's reach. It was the jury's prerogative "to reject [A]ppellant's argument that he was merely present at the scene and was oblivious to the drug-manufacturing operation." *Mikitiuk*, 213 A.3d at 305. Further, it bears repeating that the jury acquitted Appellant of numerous charges. Accordingly, there is no merit to Appellant's sufficiency issue challenging his MCS and conspiracy convictions.

In his final issue, Appellant argues the trial court erred in denying his claim that the jury's verdicts were against the weight of the evidence. Appellant's Brief at 3-5. Appellant contends the "majority of evidence against [him] rests on the information in the NPLEX … search results which was so heavily weighted as to shock one's sense of justice." *Id.* at 5; *see also id.* at 4 ("there was no DNA or fingerprint evidence linking [Appellant] to the crimes.").

"When reviewing a challenge to the weight of the evidence, we review the trial court's exercise of discretion." *Commonwealth v. Clemens*, 242 A.3d 659, 667 (Pa. Super. 2020) (citation omitted). For an appellant to prevail on a weight challenge, he must establish the evidence supporting the conviction is "so tenuous, vague, and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Akhmedov*, 216 A.3d 307, 326 (Pa. Super. 2019) (*en banc*) (citation omitted). "The weight of the evidence

is exclusively for the finder of fact, who is free to believe all, none, or some of the evidence and to determine the credibility of the witnesses." *Clemens*, 242 A.3d at 667 (citation omitted). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of evidence[.]" *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013); *see also Corvin v. Tihansky*, 184 A.3d 986, 992-93 (Pa. Super. 2018) ("if there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm." (citation omitted)).

Upon review, we discern no abuse of the trial court's discretion in rejecting Appellant's weight claim. The jury was "free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Windslowe*, 158 A.3d 698, 712 (Pa. Super. 2017). Appellant essentially asks us to make findings of fact and reweigh the evidence in his favor, which is not our role as an appellate court. *See Commonwealth v. Miller*, 172 A.3d 632, 643 (Pa. Super. 2017) (rejecting appellant's weight claim where he asked this Court to reweigh the evidence and testimony in his favor); *Mikitiuk*, 213 A.3d at 305 ("[a]ppellant requests that we re-weigh the evidence and assess the credibility of a witness presented at trial, a task that is beyond our scope of review."). Finally, and contrary to Appellant's claim, there is no constitutional requirement for the police to conduct a forensic analysis of evidence. *See Commonwealth v.*

***Gibson***, 951 A.2d 1110, 1140 (Pa. 2008).  Accordingly, Appellant's third issue fails.

Judgment of sentence affirmed.

Judge King joins the opinion.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  6/29/2022